[No. AO19128. First Dist., Div. Two. Jan. 24, 1984.]

SAN FRANCISCANS FOR REASONABLE GROWTH,
Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents;
CITICORP et al., Real Parties in Interest and Respondents.

[No. AO19130. First Dist., Div. Two. Jan. 24, 1984.]

SAN FRANCISCANS FOR REASONABLE GROWTH,
Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents;
CROW-SPIEKER # 99, Real Party in Interest and Respondent.

[No. AO19126. First Dist., Div. Two. Jan. 24, 1984.]

SAN FRANCISCANS FOR REASONABLE GROWTH,
Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents;
VINTAGE PROPERTIES, Real Party in Interest and Respondent.

[No. AO19129. First Dist., Div. Two. Jan. 24, 1984.]

SAN FRANCISCANS FOR REASONABLE GROWTH,
Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents;
LINCOLN MISSION/SPEAR ASSOCIATES,
Real Party in Interest and Respondent.

**COUNSEL**

Sue C. Hestor for Plaintiff and Appellant.

George Agnost, City Attorney, Alice Suet Yee Barkley and Melba Yee, Deputy City Attorneys, for Defendants and Respondents.

William F. McCabe, Jonathan R. Bass, Coblentz, Cahen, McCabe & Breyer, Howard N. Ellman, Kenneth N. Burns, Ellman, Burke & Cassidy,

Pettit & Martin, Robert A. Thompson, Charles G. Ehrlich and David A. Lipkin for Real Parties in Interest and Respondents.

OPINION

ROUSE, J.—

## I. *Statement of the Case*

Plaintiff, San Franciscans for Reasonable Growth (SFRG), appeals from judgments denying its four petitions for writs of mandate compelling defendant, San Francisco Planning Commission (Commission), to set aside resolutions that certified four Environmental Impact Reports (EIRs) and to void the permits that allowed the Real Parties in Interest (RPIs) to begin construction on the projects evaluated in the EIRs. The basis for SRFG's writ petitions was that, through its agencies, defendant City and County of San Francisco (City) had violated the California Environmental Quality Act (CEQA), (Pub. Resources Code, § 21000 et seq.), and the California Guidelines (Guidelines) implementing CEQA (Cal. Admin. Code, tit. 14, § 15000 et seq.).[1]

## II. *History*

Prior to 1981, the RPIs submitted proposals to the office of environmental review (OER) in the City's department of city planning (Department) for the construction of high-rise office buildings in the City's downtown area.[2] The OER reviewed the proposals and determined that each project required an EIR. (Guidelines, §§ 15081, 15082, 15084.) Writing the EIRs was the Commission's responsibility,[3] and, between April and November 1981, the

---

[1]We cite the Guidelines as they appeared during the time when the alleged violations occurred. Since that time, they have been revised and completely reorganized. Therefore, when we cite the Guidelines as they now exist, such citations will be labeled "current Guidelines."

[2]Crow-Spieker #99 proposed a 24-story office/condominium building located at Montgomery and Washington Streets (Montgomery Project). Citicorp proposed a 40-story office building at Sansome and Sutter Streets (Sansome Project). Vintage Properties proposed a 19-story office building south of Market on Spear Street between Mission and Howard Streets (Spear Project). And, in the same block as the Spear Project, Lincoln Mission/Spear Associates proposed a 20-story building at Mission and Spear Streets (Mission Project).

[3]Acting as the "lead agency," the commission had the principal responsibility for approving the projects; as such, it was required to prepare the EIRs. (Guidelines, §§ 15030, 15065.)

Commission published draft EIRs for each project. In these drafts, the Commission was required to analyze not only the direct environmental impacts of the individual projects but also the cumulative impacts resulting from each individual project in combination with closely related past, present and "probable" future projects. (CEQA, § 21083, subd. (b); Guidelines, §§ 15023.5, 15027, subd. (a), 15143, subds. (a)-(e).)[4] In order to analyze such cumulative impacts, the Commission first accounted for past office development by describing the status quo downtown with respect to various areas[5] of potential impact. Then, the Commission analyzed the cumulative impacts in these areas, i.e., the changes in the status quo, resulting from present and "probable" future office development. The Commission based this part of its analyses on the amount of square footage of new office space that would be added to downtown San Francisco by (1) projects that had been approved, but were not yet under construction and (2) projects under construction. This figure (total square feet of new office space), and the criteria for determining it, had critical significance, being integral to the cumulative impact analyses of such important areas of concern as public transit, automobile and pedestrian traffic, parking, City services, and housing.[6]

Following publication of the drafts, the Commission received comments about each one from the public and, between May and December 1981, held hearings on their adequacy. SFRG attended all of these hearings and vigorously attacked the draft EIRs. SFRG asserted, inter alia, that the total square footage of cumulative development used in the cumulative analyses was vastly underestimated; that, as a result, the cumulative impacts from

---

[4]RPI Citicorp suggests that a cumulative impact analysis was unnecessary in the EIRs. However, given the size, type and location of these projects, such a suggestion is absurd and reflects an inclination toward seeking ways around CEQA and the Guidelines via an overly legalistic approach to them. We note that the Guidelines, section 15143, subdivision (a), states that cumulative effects "shall . . . be discussed when found to be significant." And, as early as the notices requiring that EIRs be prepared, the OER pointed out that the cumulative impacts from these and other related projects would be significant.

[5]All drafts discussed (1) land use and zoning; (2) urban design; (3) employment, housing and fiscal factors; (4) transportation, circulation and parking; (5) air quality; (6) construction noise; (7) energy; (8) cultural resources; (9) land resources; and (10) utilities and public services.

[6]The accuracy and thus the validity of the cumulative impact analyses hinge on this figure (amount of new development), because the Commission extrapolated the impacts from this figure using a statistical methodology. One example makes this clear: the relevant unit for measuring demand on the City bus system (Muni) is the "person trip." The demand created by cumulative office development is calculated at the rate of 17.5 "person trips" per 1,000 square feet of office space. When the total number of "person trips" is viewed in light of Muni's capacity, the cumulative impacts on Muni are assessable. Consequently, the amount of square feet of development used to calculate the total demand (i.e., total number of person trips) is the key to an accurate analysis of cumulative impacts on Muni.

new development were grossly understated; and that as a further result, the measures proposed to mitigate the adverse impacts that were identified were insufficient.[7] After each hearing, the Commission collected the comments, prepared responses to them and revised and published final EIRs, each of which included the entire set of comments and responses regarding its predecessor draft. Although the final EIRs acknowledged the existence of greater amounts of cumulative development than they had considered in calculating cumulative impacts, the calculations themselves, including the original totals of square footage, remained unchanged.[8] Consequently, the cumulative impact analyses, as a whole, though somewhat revised from the draft versions, remained basically the same.

Between August 1981 and February 1982, the Commission held hearings to consider certifying the final EIRs and approving the projects. Except for the Sansome Project hearing, SFRG attended these hearings and objected to certification of the EIRs and approval of the projects. However, despite these objections and objections from others, the Commission certified the EIRs and approved the projects. The Commission adopted the following findings with respect to each project: (1) that it will have a significant effect on the environment; (2) that measures have been imposed on the project that will mitigate the significant effects; and (3) that the project will have certain benefits that override any significant effects not mitigated. (See §§ 21081, 21083, CEQA; §§ 15088, 15089, Guidelines.)

Thereafter, between January and March 1982, the Commission filed a "Notice of Determination" for each project. (See §§ 21108, 21152,

---

[7]At the Commission hearings, SFRG alleged that the Commission should have considered over 20 million square feet of new development. The reports analyzed less than half of that amount. (See fn. 8, *infra.*) SFRG now asserts that the amount that should have been analyzed is 39 million square feet.

[8]The final EIRs used totals ranging from 6.3 to 8.8 million square feet. However, elsewhere the EIRs acknowledged between 12 and 18 million square feet. The following is a breakdown by project:

| Project | Amount Considered in Analysis (Million Sq.Ft.) | Amount Acknowledged |
|---|---|---|
| Montgomery | 8.7 | 12-13 |
| Sansome | 6.3 | 16.2 |
| Spear | 8.8 | 18.1 |
| Mission | 8 | 16.4 |

The disparity between the figures in *each* EIR in general reflects the addition of unapproved projects currently under review. However, given the fact that the EIRs were prepared at the same time and published within a relatively short time of each other, we do not understand the reason for the disparity in the figures among the EIRs, especially since the Commission wrote them all. The briefs did not provide an explanation; nor was an adequate one presented at oral argument before us.

CEQA.) By so doing, the Commission commenced a 30-day period within which any challenge to an EIR or final project approval must be made. (§ 21167, CEQA.) Immediately thereafter, in March and April 1982, SFRG commenced these mandamus actions.

Prior to any decision by the trial court, the department of public works issued permits to the RPIs, who began work on their projects. In May 1982, SFRG appealed the issuance of these permits to the Board of Permit Appeals (Board). The Board held de novo hearings at which it exercised its independent power to review the propriety of both the EIR certifications and the project approvals. At these hearings, SFRG again argued that the EIRs were defective because their cumulative impact analyses underestimated the amount of downtown development. In support of this argument, SFRG produced a list of projects it had compiled from the Commission's records that allegedly documented over 25 million square feet of new development. SFRG also argued that by initiating a separate EIR to study cumulative downtown development (Downtown EIR) by means of an analytical review of several alternative zoning modification plans, the Commission was precluded from approving any of these four projects prior to the completion of that EIR. In late May 1982, after the hearings, the Board denied each appeal and made its own findings which confirmed and adopted verbatim the Commission's findings regarding each project.[9]

Shortly thereafter, SFRG amended its mandamus petitions, seeking to void the notices of determination and the building permits in addition to setting aside the Commission's EIR certifications and project approvals. The trial court held hearings between June 11 and July 16, 1982. On July 22, 1982, the court denied all of the petitions, issuing a memorandum of decision in each case to the effect that (1) neither the Commission nor the Board had abused its discretion in certifying the EIRs and approving the projects; (2) the findings of the Board and the Commission were supported by substantial evidence; (3) *"the standards employed and the projects analyzed by*

---

[9]SFRG complains that the City issued the notices of determination "prematurely," i.e., before the department of public works had issued building permits to the RPIs. Once the permits were issued, SFRG could challenge their issuance only by first filing an appeal before the Board. As noted above, the Board would then review the decisions made by the Commission. We share SFRG's concern and seriously question whether it is appropriate for the City to issue notices of determination before the permit issuance and administrative appeal process is completed. By issuing notices when it does, the City creates the possibility (a reality in this case) that both a court and the Board would be reviewing the propriety of Commission decisions at the same time. Such simultaneous consideration is contrary to the interests of judicial economy and could result in an anomalous situation in which the court and the Board reach different conclusions concerning Commission decisions.

*the Planning Commission in evaluating the cumulative impacts resulting 'from the incremental impact of the project[s] when added to other closely related past, present and reasonabl[y] foreseeable future projects' (14 Cal. Admin. Code § 15023.5(b)) were reasonable and rational and did not constitute an abuse of discretion"* (italics added); (4) the mitigation measures imposed on each project were legally sufficient and supported by substantial evidence; and (5) the pendency of the Downtown EIR did not preclude the approval of these or any other projects.[10]

### III. *Scope of Review*

■ The scope of review on this appeal is limited to the question of whether the City's agencies abused their discretion in certifying the EIRs and approving the RPIs' projects. (§§ 21168, 21168.5, CEQA; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].) ■ This court may find such an abuse if the agencies failed to comply with CEQA and the Guidelines or if their findings are not supported by substantial evidence in light of the whole record. (*Ibid.; Environmental Council* v. *Board of Supervisors* (1982) 135 Cal.App.3d 428, 436 [185 Cal.Rptr. 363].)[11] ■ It is not our function to pass on the correctness of an EIR's environmental conclusions (*Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 355 [182 Cal.Rptr. 317]) or to substitute our judgment for that of the City agencies empowered to make the decisions here under review (*El Dorado Union High School Dist.* v. *City of Placerville* (1983) 144 Cal.App.3d 123, 130 [192 Cal.Rptr. 480]). However, we do have a duty to consider the legal sufficiency of the steps taken by the City agencies (*Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712, 725 [117 Cal.Rptr. 96]), and we must be satisfied that these agencies have fully complied with

---

[10]These findings in each memorandum are identical.

[11]The City argues at length about the scope of review here. The City asserts that the "substantial evidence" rule controls review of this case, and thus "the scope of this court's review of the instant cases is limited to an examination of the individual records to determine if the [agency's] decisions are supported by substantial evidence therein." Generally, we agree with the City's articulation of this rule. (See 5 Witkin, Cal. Procedure (2d ed. 1971) §§ 217, 220, pp. 3974, 3977.) However, we reject the inference, implicit in the City's argument, that when, as here, the rule applies, the court's role is *only* to apply this rule. On the contrary, section 21168 of CEQA makes section 1094.5 of the Code of Civil Procedure applicable in situations where, as here, local agencies were required by law to hold hearings. Section 1094.5 mandates that we also review whether the agencies have proceeded in a manner required by law. (Code Civ. Proc., § 1094.5, subd. (b).) The City omits reference to this aspect of our role as reviewing court. However, we note that the trial court expressly applied section 1094.5 and the City itself admits that the trial court applied the proper standard and scope of review.

the procedural requirements of CEQA, since only in this way can the important public purposes of CEQA be protected from subversion. (*Atherton v. Board of Supervisors* (1983) 146 Cal.App.3d 346, 350 [194 Cal.Rptr. 203], citing *Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1027 [185 Cal.Rptr. 41], and *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67]; *Rural Land Owners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1018-1021 [92 Cal.Rptr. 325].)

## IV. *Adequacy of the Cumulative Analyses*

■ SFRG challenges the trial court's findings that the "standards employed and the projects analyzed" in the EIRs' cumulative analyses were reasonable and rational and did not constitute an abuse of discretion. SFRG contends, as it has since the draft EIR hearings, that the cumulative impact analyses in the EIRs are legally defective because, in drafting them, the Commission viewed the requirements of CEQA and the Guidelines concerning such analyses too narrowly and thereby underestimated the actual amount of new downtown development, understated the true impacts from such development, and thereby undermined any effort to provide adequate mitigation measures. Specifically, SFRG argues that the City violated CEQA by basing its cumulative impacts analyses on only approved projects, not yet constructed, and projects under construction. We agree.

### A. *Was it reasonable, feasible and practical to include projects "under review" in the cumulative analyses?*

■ A fundamental purpose of CEQA is to ensure that governmental agencies regulate their activities "so that major consideration is given to preventing environmental damage, while providing a decent home and satisfying living environment for every Californian." (§ 21000, subd. (g), CEQA; see *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 263 [104 Cal.Rptr. 761, 502 P.2d 1049] ["the Legislature intended that environmental considerations play a significant role in governmental decision-making . . . ."].) ■ The heart of CEQA is the EIR. (*El Dorado Union High School Dist.* v. *City of Placerville, supra,* 144 Cal.App.3d 123, 132.) Its purposes are manifold, but chief among them is that of providing public agencies and the general public with detailed information about the effects of a proposed project on the environment. (*Ibid.,* § 21061, CEQA; § 15003, subd. (c), current Guidelines.)

■ Part of this vital informational function is performed by a cumulative impact analysis. The scope and requirements of such an analysis are found in two sections of the Guidelines.[12] (See § 21083, CEQA, for the underlying statutory authority for these requirements.) Section 15142 provides, in pertinent part, that "An EIR must include a description of the environment in the vicinity of the project, as it exists before commencement of the project, from both a local and regional perspective. [¶] (a) Knowledge of the regional setting is critical to the assessment of environmental impacts. Special emphasis should be placed on environmental resources that are rare or unique to that region. Specific reference to related projects, both public and private, both existent and planned, in the region should also be included, for purposes of examining the possible cumulative impact of such projects."

More specifically, section 15023.5 of the Guidelines provides, "Cumulative impacts refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts. [¶] (a) The individual effects may be changes resulting from a single project or a number of separate projects. [¶] (b) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonabl[y] foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time. [¶] (c) A discussion of cumulative impacts shall reflect their severity and significance but need not be discussed in as great detail as the direct effects of the project. The discussion of cumulative impacts should be guided by a standard of practicality and reasonableness. The following (three) elements are necessary to an adequate discussion of cumulative impacts: [¶] (1) A list of projects producing related or cumulative impacts, including those projects outside the control of the agency; [¶] (2) A summary of the expected environmental effects to be produced by those projects with specific reference[s] to additional information where that information is available, and [¶] (3) A reasonable analysis of the cumulative impacts of the relevant projects."

As set forth above, an adequate cumulative analysis requires a list of projects producing related or cumulative impacts. (Guidelines, § 15023.5, subd. (c)(1).) The contents of this list are "closely related past, present, and reasonabl[y] foreseeable probable future projects." (Guidelines, § 15023.5, subd. (b); see CEQA, § 21083, subd. (b) ["past projects," "other current projects," and "probable future projects."].) As we have

---

[12]These requirements are now found in substantially similar form in sections 15130 and 15355 of the current Guidelines.

noted, the Commission read this language to mean (1) approved, but not yet constructed, projects, and (2) projects under construction. SFRG contends that (3) projects under environmental review and (4) projects formally announced by developer also should have been considered.

█ In formulating the list of projects to be considered in each cumulative analysis, the Commission had a duty to interpret the above-cited Guidelines so as to afford the fullest possible protection to the environment within the reasonable scope of their language. (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, 259; see current Guidelines, § 15003, subd. (f).) Moreover, the Commission also had a duty to "use its best efforts to find out and disclose all that it reasonably can." (Guidelines, § 15140, subd. (g).) █ █ █ █ █ █ We find that, in omitting from its calculations and analyses of cumulative impacts other closely related projects that were currently under environmental review,[13] the Commission applied an unreasonably narrow interpretation of the Guidelines and, in so doing, abused its discretion.

█ Because projects under environmental review (other than those that were subjects of the EIRs) could easily have been ascertained by the Commission from its own records, there was no practical or reasonable barrier to their disclosure and inclusion in the analyses.[14] Moreover, the use of a larger base amount of square footage of new development would not have made the statistical method or calculations any more difficult to perform than they were. (See fn. 6, *ante.*) The only reason we can infer for the Commission's failure to consider and analyze this group of projects was that it was more expedient to ignore them. However, expediency should play no part in an agency's efforts to comply with CEQA. Finally, given

---

[13]This category—related projects currently under environmental review—includes those related projects for which an EIR has been required and also those related projects for which a negative declaration (current Guidelines, §§ 15070-15075, 15371), a statutory exemption (current Guidelines, §§ 15260-15277), or a categorical exemption (current Guidelines, §§15300-15329, 15354) is being considered. In addition, although our holding here is based on the omission of projects "under review" from the cumulative analysis, we note that section 15023.5, subdivision (c)(1), of the Guidelines (current Guidelines, § 15130, subd. (b)(1)(A)) requires the consideration of projects "outside the control of the agency." Therefore, in performing a cumulative analysis, an agency must consider more than other related projects under its own administrative jurisdiction. Under the circumstances of this case, for instance, we think that, where feasible, the Commission had a duty to use reasonable efforts to discover, disclose, and discuss related projects which are under the administrative jurisdictions of other city, state, and federal agencies.

[14]Projects are constantly being fed into the environmental review process. The problem of where to draw the line on "projects under review" that must be included in the cumulative impact analysis of a particular project could be solved by the use of a reasonable cutoff date which could be set for every project according to a standard procedure. This City itself makes such a suggestion.

the Commission's easy access to the information and the fact that its analytical process is unaffected by the size of the project list, the inclusion of these projects was more reasonable than their exclusion, especially in light of the particular language of section 15023.5 of the Guidelines, quoted *ante*. Had that section only required a list of "related projects," the Commission's interpretation of the section might have been more defensible. However, the section is much more precise, and so should have been the Commission's approach to it.

First, experience and common sense indicate that projects which are under review are "reasonabl[y] foreseeable probable future projects." A significant investment of time, money and technical planning in the construction of a high-rise office building has necessarily occurred before a project is even submitted to the OER for initial review. Once environmental review commences, planning and investment in the project inevitably increase as the building is changed and modified in order to minimize concern over environmental impacts. Having made such a substantial commitment to the preconstruction phase of a high-rise project, what developer, whose project is being reviewed, would argue most strenuously that his project is *not* a reasonably foreseeable project? Ordinarily an office building project that is awaiting environmental approval has reached a stage of development where the developer, financial institutions, and contractors almost certainly view its construction to be a very real probability, and not without reason. Such a view is doubtless shared by those performing the environmental review and preparing the EIR.

Second, we find it illogical that an EIR should carefully evaluate the direct impacts of one project which is "under environmental review," but completely ignore the cumulative impacts of that project's siblings in the same category. Nothing makes the EIR's subject project more "probable" or "foreseeable" than any of the other projects under review, just as nothing makes them less so.

In light of the foregoing, we must reject the argument that, because some of the projects under review might never be built, it was reasonable for the Commission not to consider any of them in its cumulative analyses. Such argument is without merit. The fact that the EIR's subject project itself might be built, rather than the fact that it might not be built, creates the need for an EIR. Similarly, the fact that other projects being reviewed are as close to being built as the subject project makes it reasonable to consider them in the cumulative analyses.

We also reject the argument that the Commission was entitled to ignore projects that have not passed all regulatory hurdles. The City and all

RPIs cite *Natural Resources Defense Council, Inc.* v. *California Coastal Zone Conservation Com.* (1976) 57 Cal.App.3d 76 [129 Cal.Rptr. 57], and *Lake County Energy Council* v. *County of Lake* (1977) 70 Cal.App.3d 851 [139 Cal.Rptr. 176], in support of that proposition, but we find them inapposite.

*Natural Resources Defense Council, Inc., supra,* 57 Cal.App.3d 851, may be viewed as standing generally for the cited proposition. However, the case involved the application of the California Coastal Zone Conservation Act of 1972 (former Pub. Resources Code, §§ 27000-27650, repealed Jan. 1, 1977) and not CEQA or the Guidelines. Hence it is of little value in illuminating the proper course for the Commission to have followed in this case.

In *Lake County Energy Council* v. *County of Lake, supra,* 70 Cal.App.3d 851, the court found that an EIR for three exploratory wells was adequate despite its failure to consider the impacts of a geothermal production unit that might be built if the wells proved successful. The court reasoned that (1) such a production unit was a remote contingency until actual geothermal resources were proven and their size evaluated, and thus discussion of such a unit involved sheer speculation as to future consequences (*id.,* at pp. 854-855); and (2) issuing permits to allow the three exploratory wells did not commit the local agencies to geothermal energy production facilities in the area because the EIR for the test wells stated that, if resources were found, a very comprehensive EIR would be required prior to any commercial development (*id.,* at p. 856).

*Lake County* is readily distinguishable from this case. First, the size of the possible geothermal unit (and as a result its impacts) could not be judged until the magnitude of the geothermal resources was known. Here, the physical elements (e.g., height, floor space) of related high rise projects under review are sufficiently quantified so as to make an analysis of their future impacts far more accurate and useful than sheer speculation. Second, unlike the geothermal unit, whose very existence was dependent on the success of the project under study in the EIR, other high-rise projects under review are not such remote and contingent possibilities. Projects under review are independent endeavors, and their developers aggressively seek individual approval. This independence and individualized potential approval makes it all the more important that they be cumulatively considered because, unlike the development of geothermal resources, which involves a fairly unified and concerted coordination of individual projects (e.g., wells, pipelines, production units, storage facilities), the development of downtown San Francisco generally occurs bit by bit. No one project may appear to cause

a significant amount of adverse effects. However, without a mechanism for addressing the cumulative effects of individual projects, there could never be any awareness of or control over the speed and manner of downtown development. Without such control, piecemeal development would inevitably cause havoc in virtually every aspect of the urban environment.

### B. *Was failure to include projects under review an abuse of discretion?*

Our conclusion that, under the language of the Guidelines, it was both reasonable and practical for the Commission to disclose and include projects "under review" in the cumulative analyses does not fully explain why we find the failure to include them an abuse of discretion. Therefore, we return to the language of section 15023.5 of the Guidelines.

Subdivisions (c) (2) and (3) of that section required the Commission to summarize the environmental effects and reasonably analyze the cumulative impacts of the projects it decided to consider. The point of the analysis is to reflect the "severity" and "significance" of the cumulative impacts. (Guidelines, § 15023.5, subd. (c).)

### 1. *Severity and Significance.*

As we noted above, the Commission's analyses considered between 6.3 and 8.8 million square feet of closely related new development, but the EIRs acknowledged between 12 and 18 million square feet, depending on which EIR one reads. (See fn. 8, *ante.*) The disparity between what was considered and what was known is the basis upon which we find an abuse of discretion. Since all of the EIRs exhibit such a disparity and the reason in each EIR (omission of projects "under review" from the analysis) is identical, we will examine only one EIR for purposes of example and explanation.

The Sansome Project (Citicorp) draft EIR was issued on April 10, 1981, and was the first of the four drafts to be published within a seven-month period.[15] In the draft and the final EIR, the Commission acknowledged 16.2 million square feet of new development, but analyzed only 6.3 million. In this case, therefore, the Commission's analysis left out nearly 60 percent of the total amount of related development. (We assume that the total was 16.2 million square feet, rather than the 20 or 39 million alleged by SFRG.) An omission of such magnitude inevitably renders an analysis of cumulative

---

[15]Publication dates of the other three drafts were as follows: Mission Project—May 22, 1981; Spear Project—November 6, 1981; and Montgomery Project—November 13, 1981.

impacts inaccurate and inadequate because the severity and significance of the impacts will, perforce, be gravely understated. We find an apt example of this problem and its consequences by looking at the analysis of the cumulative impacts on the City's bus system (Muni).

Using 6.3 million square feet of development (see fn. 8, *ante*), the EIR concludes that there will be a 25 percent increase in ridership. Given present capacity, 21 of the 38 bus lines servicing downtown "would be operating in excess of recommended maximum capacities, at load factors of 1.0 or greater, by 1983 with or without the [Sansome] project." A "load [factor] of 1.0" means that the number of passengers is 1.5 times the number of seats on the bus (obviously crowded conditions). The report also states that Muni had plans to increase its 1980 capacity by only 13 percent. However, the report continues, Muni might be unable to fund such an increase or even maintain existing levels of service because of the limited availability of support from the City's general fund and expected reductions in federal transit money. Consequently, if new funding sources are not found, Muni will have to raise fares in order to maintain and expand services. Fare hikes will inevitably cause certain people to shift to other modes of transportation, thereby adding again to the cumulative impacts on those other modes. For example, cumulative development will increase the number of cars driving the streets and needing parking places; an overflow from Muni will add more cars, increase street congestion and air pollution, and impede Muni service, further aggravating the impacts on Muni and lowering levels of service.

All of the other EIRs paint a similarly grim picture of the impacts on Muni.[16] The EIRs' analyses, as far as they went, are corroborated by the former general manager of the Public Utilities Commission and member of the Commission, Richard Sklar, who stated at the Mission Project's draft EIR hearing: "I think that the EIR is deficient in pointing out how serious the transit impacts are—not only of this development but of all developments in downtown. When we have numbers like 1.06 of capacity, 1.19 of capacity . . . , it doesn't give any picture of the impact on the riders of those routes attempting to get downtown to work in the morning and go home at night. It is a horror. Our major trunk lines to downtown are all over capacity. This is talking about capacity problems above and beyond 50 percent above seated capacity. That's nearing cattle car status on the N line in the morning, the 38, and the 1 Express. It's no way for people to be transported

---

[16]We note that Muni is only one aspect of the transportation scene being evaluated in the EIRs. Also evaluated were BART, SAMTRANS, Southern Pacific, AC Transit, automobile traffic on the streets, freeways and bridges, pedestrian traffic, and parking. (See also fn. 5, *ante*.)

to and from work, and yet we can't add a bus or rail car or any other means to get the people downtown. We don't have the vehicles. We don't have the money, and the City's chances of picking up additional money in many of the traditional ways are limited. . . ."

What would the Sansome Project EIR's analysis have concluded regarding the impacts on Muni, had it considered 16.2 rather than 6.3 million square feet of development? We believe that the true severity and significance of the cumulative impacts cannot be derived from the Sansome EIR's analysis as it stands simply by doubling or tripling the statistics, a suggestion made by the Commission in the Spear Project EIR, which acknowledged 18.1 million square feet of new development but analyzed only 8.8 million. On the contrary, it is vitally important that an EIR avoid minimizing the cumulative impacts. Rather, it must reflect a conscientious effort to provide public agencies and the general public with adequate and relevant detailed information about them. (CEQA, § 21061.) The EIRs in this instance have failed to do this.

## 2. *Mitigation and Overriding Benefits.*

 The danger created by providing understated information concerning the severity and significance of cumulative impacts arises *after* an EIR has been certified and the Commission is considering final project approval. It is at this point that the Commission decides what measures should be imposed on the project in order to mitigate the impacts which have been identified in the EIR. The Commission then determines whether there are benefits from a project that override any impacts which are not mitigated.

For example, with respect to the Muni impacts, the Commission concluded in each case that, in light of the EIR's analysis, the impacts on Muni will be mitigated by requiring that the project's sponsor help Muni expand its capacity by paying an unspecified amount of money at an unspecified time in compliance with an as yet unenforced or unspecified transit funding mechanism.[17] In addition, the Commission required that the project sponsors permit Muni to attach eye-bolts to the sides of their buildings, if overhead lines for expanded Muni service made such bolts necessary. However, had the EIRs considered a more accurate amount of cumulative development, they would have undoubtedly forecast greater catastrophe for Muni. Faced with that probability, the Commission might well have concluded that it was necessary to impose much stronger mitigation measures. However,

---

[17]In its resolutions approving two of the projects, the Commission refers to a specific funding mechanism provided by board of supervisors Ordinance No. 224-81.

because the EIRs underestimated the amount of downtown development, the Commission had no opportunity to deal with the true severity and significance of its impacts, not just on Muni, but on the whole spectrum of environmental concerns potentially affected by high-rise development.

Besides subverting the Commission's ability to adopt appropriate and effective mitigation measures, the understatement of cumulative impacts skewed the Commission's perspective concerning the benefits of the particular projects. In all four cases, the Commission found that the following benefits overrode any unmitigated impacts from the projects: (1) the creation of construction and permanent jobs; (2) the improvement of downtown land; and (3) the strengthening of downtown as a compact center for financial, technical, professional and administrative services. Of course, these three benefits are also present in the 12-18 million square feet of projects that should have been included in the cumulative analyses. However, had the analyses presented a true picture of the impacts from a more accurate amount of "reasonabl[y] foreseeable" development, the Commission might well have found that what they thought were "benefits" did not so much override unmitigated environmental impacts as actually cause them. The inadequate cumulative analysis prevented the Commission from gaining a true perspective on the consequences of approving these projects.

### 3. *Other Important Policies.*

Not only do these inadequate cumulative analyses subvert mitigation and color the benefits of the projects, but they also frustrate many of the fundamental policies behind CEQA. For instance, since the EIRs do not describe the true severity and significance of the cumulative impacts adequately, they cannot demonstrate, to an apprehensive citizenry already reeling from the effects of past downtown development, that the Commission has, in fact, analyzed and considered the environmental consequences of its actions. (See § 15003, subd. (d), current Guidelines; *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 86.) Nor can these EIRs "enable the public to determine the environmental and economic values of their elected and appointed officials thus allowing for appropriate action come election day should a majority of the voters disagree." (§ 15003, subd. (e), current Guidelines; see *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67].) To the contrary, these EIRs never forced the Commission's true values into the public forum. Rather, they allowed the Commission to appear to have acted reasonably.

The City and RPIs have all reminded us that an EIR need not be exhaustive; that its sufficiency must be reviewed in light of what is reason-

ably feasible; and that we should look for adequacy and completeness, not perfection.[18] (*San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100].) However, we note that section 15147 of the Guidelines states, in pertinent part, that "The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR. [¶] (a) An EIR on a construction project will necessarily be more detailed in the specific effects of the project than will be an EIR on the adoption of a local general plan or comprehensive zoning ordinance because the effects of the construction can be predicted with greater accuracy." Moreover, an EIR "must produce information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned"; and agencies must make "an objective, good-faith effort to comply [with CEQA]." (*Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 287 [152 Cal.Rptr. 585].)

### V. *Conclusion*

In light of our analysis and discussion, we find that the EIRs were inadequate and incomplete, because, in drafting them, the Commission failed to interpret the requirements of a cumulative impact analysis so as to afford the fullest possible protection to the environment. Instead, the Commission abused its discretion by giving such requirements an unreasonably narrow scope, thereby omitting information that it would have been both reasonable, feasible and practical to include. As a result of this omission, the EIRs "provide[d] neither the responsible agency nor the public with the type of information called for under CEQA." (*Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 411 [151 Cal.Rptr. 866].)

Given these findings, we are compelled to conclude that the trial court erred in its findings concerning the reasonableness of the standards used and projects included in the Commission's cumulative impact analyses. In view of our conclusion, we need not address other issues raised by plaintiff SFRG.

The judgments are reversed and the matters remanded to the trial court with directions to issue a writ of mandate requiring the Commission to redraft the EIRs for all four projects in compliance with the requirements

---

[18]We are also mindful of the fact that, under section 15023.5 of the Guidelines, a cumulative analysis need not provide as great detail as the analysis of the direct impacts of the project being evaluated in the EIR. (Guidelines, § 15023.5, subd. (c).) However, we do not consider the omission of up to 60 percent of the projects that should have been analyzed in the cumulative analyses to be merely a problem of insufficient details.

of CEQA as expressed herein within a reasonable period of time as determined by the trial court.[19]

Kline, P. J., and Miller, J., concurred.

---

[19]We strongly suspect that each of the projects is well under way—some, undoubtedly, nearing completion. Obviously, it would create economic havoc to interrupt such activity at this point, and it is not our purpose to do so. We emphasize, however, that a determination by the trial court that construction need not be halted would not render the rewriting of the EIRs a meaningless task because the new EIRs would finally provide the public with accurate information concerning the environmental consequences, not only of these particular downtown development projects but also related and cumulative downtown development. Also, we remind those agencies directly responsible for compliance with the law (CEQA, in this instance) that they do a great injustice to both developers and members of the general public by an insufficient evaluation of the potentially severe impacts upon the environment of San Francisco which result from construction of these types of projects (e.g., the impact caused by transporting more live bodies in and out of an already highly congested and geographically confined area).