[No. A032830. First Dist., Div. Two. Aug. 10, 1987.]

SAN FRANCISCANS FOR REASONABLE GROWTH, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents;
CITICORP et al., Real Parties in Interest and Respondents.

[Opinion certified for partial publication.*]

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication with the exception of parts I, III, IV, V, VI and VII of the majority opinion.

**COUNSEL**

Sue C. Hestor and Herb Schwartz for Plaintiff and Appellant.

George Agnost and Louise H. Renne, City Attorneys, Paula Jesson and Noreen M. Ambrose, Deputy City Attorneys, for Defendants and Respondents.

Howard N. Ellman, Kenneth N. Burns Ellman, Burke & Cassidy, Jonathan R. Bass and Coblentz, Cahen, McCabe & Breyer for Real Parties in Interest and Resondents.

## OPINION

ROUSE, J.—Plaintiff, San Franciscans for Reasonable Growth (SFRG), appeals from a judgment discharging a writ of administrative mandate. That writ required the City and County of San Francisco (City), its Planning Commission (Commission) and its Board of Permit Appeals (Board), to vacate certification of Environmental Impact Reports (EIRs) and prepare Supplemental Environmental Impact Reports (SEIRs) for two projects sponsored by real parties in interest, Citicorp/Citibank N.A. (Citicorp) and Crow-Spieker #99 (Crow-Spieker). The superior court issued the writ at our direction after we concluded in an earlier opinion (*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61 [198 Cal.Rptr. 634]) that the original EIRs were inadequate because the cumulative impact analysis they contained was unduly restrictive and thus failed to comply with the purpose of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] Plaintiff appeals from the judgment of the superior court which found that in preparing the SEIRs the City had complied with the requirements of the writ to examine the cumulative impacts of these projects in light of an expanded list of probable future projects.

Because our earlier opinion outlines the early history of these projects, we will discuss only those events which occurred after we issued our opinion in January 1984. After we remanded the case to the trial court for issuance of a writ, plaintiff unsuccessfully sought a temporary restraining order which would have prevented the City from issuing further permits or certificates of occupancy for the four buildings. The court did order the City to give plaintiff notice of applications for or issuance of permits or certificates of occupancy.

Before the court issued the writ all parties were permitted to present their views on the proposed contents of the writ via briefing and oral argument. On May 8, 1984, the superior court ordered issuance of a peremptory writ[2] of administrative mandamus directed to the City, the Commission and the Board. The writ directed these agencies to vacate certification of the EIRs and to prepare SEIRs for each project, to review the SEIRs for com-

---

[1] The original appeal involved four projects. The parties involved in two of those projects settled after the second round of administrative proceedings and are not therefore parties to this appeal.

The cases were not consolidated in the superior court, but were joined for the purpose of briefing and oral argument.

[2] Although the superior court actually issued two writs, one on May 14, 1984, and another May 17, 1984, they are of identical language and will for purposes of convenience be referred to as "the writ."

pleteness and accuracy before certifying them, to reconsider in light of the SEIRs the mitigation required of the project sponsors, and to withhold final certificates of occupancy for the projects.

SEIRs for the Citicorp and Crow-Spieker projects were published July 23, 1984, one month before a public hearing was held on the draft reports. In a document dated November 26, 1984, the City's planning department summarized the various public comments, including those by SFRG, on the draft SEIRs and gave its replies to those comments. On December 6, 1984, the Commission certified the SEIRs and approved the projects.

SFRG appealed the approval to the Board. On appeal SFRG contended that the SEIRs had "an inadequate and legally deficient cumulative impact analysis," that certification of the SEIRs was improper because they were substantially amended without additional public hearings on the amendments, and that no additional mitigation was imposed despite the findings of severe adverse impacts. After a hearing on the appeal on March 6, 1985, the Board upheld the decision of the Commission. The Board did impose a job mitigation requirement upon Citicorp; a similar requirement had previously been imposed on the Crow-Spieker project. SFRG requested, but was denied, a rehearing.

Still dissatisfied with the SEIRs, SFRG sought an order on the authority of Code of Civil Procedure section 1097 to show cause why petitioners should not be held in contempt for failing to comply with the writ. The court conducted a hearing June 25, 26 and 27, 1985, on the sufficiency of the return on the writ. By an order issued July 16, 1985, the court concluded that the City had complied with the terms of the writ.

SFRG requested a statement of decision, which the court declined to provide. On September 10, 1985, the court issued an "Order/Judgment Discharging Writ." SFRG filed a timely notice of appeal.

In our earlier decision we found the cumulative impact analyses of the EIRs to be insufficient because those impacts were evaluated using a list of projects which included only those projects already approved but not yet under construction and projects actually under construction. (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco, supra,* 151 Cal.App.3d 61, 72.) We concluded that it would have been both practical and reasonable for the City to include in the cumulative analyses projects under environmental review, even if the projects had not yet surmounted all the "regulatory hurdles." (*Id.,* at pp. 74-75, 77.)

By its writ the lower court directed the City and its agencies to prepare SEIRs analyzing the cumulative impacts of the "subject project together with other closely related past, present and reasonably foreseeable probable future projects." The City was directed to include in its list of probable future projects "proposed but as yet unbuilt office projects in downtown San Francisco which meet any of the following criteria: [¶] (1) Projects which you currently have under environmental review, which shall include projects for which an application has been submitted for environmental review and the file for which application has not been closed or become inactive; (2) Projects for which a negative declaration has been issued; (3) Projects which hold a statutory exemption; (4) Projects which hold a categorical exemption; (5) Projects falling under the jurisdiction of other governmental agencies."

It was pursuant to this writ that the City prepared the SEIRs. The trial court then found the SEIRs, which analyzed cumulative impacts based upon this expanded list of projects, to be an adequate return to the writ.

## I.*

. . . . . . . . . . . . . . . . . . . . . .

## II.

SFRG complains that the SEIRs fail as documents designed to inform decisionmakers and the public of the environmental impact of these projects because they are confusingly written and difficult to understand. Guideline 15140 (Cal. Admin. Code, tit. 14, § 15140)[3] provides that "EIRs shall be written in plain language . . . so that decisionmakers and the public can rapidly understand the documents."

At oral argument SFRG reiterated its contention that the SEIRs were so confusing they could not be understood by the interested citizen, even those of substantial education and experience in dealing with such documents. This allegation is indeed, a serious one. If the function of an EIR is to inform decisionmakers and the public (see Guideline 15140) about the impacts of a project, then documents which are hypertechnical and confusing in their presentation may be incomprehensible to the very people they are meant to inform.

---

*See footnote, *ante,* page 1544.

[3] All subsequent references to Guidelines refer to sections in the California Administrative Code, title 14.

Absent any California authority on how comprehensible EIRs must be, SFRG has urged us to adopt the standard for federal EIRs in this circuit as set out in a Ninth Circuit decision which issued several days before our case was taken under submission. (*Oregon Environmental Council* v. *Kunzman* (9th Cir. 1987) 817 F.2d 484.) The Ninth Circuit case interprets the National Environmental Policy Act of 1969 (42 U.S.C. § 4332(C)) and its implementing regulations (40 C.F.R §§ 1500-1508 (1986)). While the federal statute and its regulations are similar to provisions in the California law (cf. 40 C.F.R. § 1502.8 (1986) with Guideline 15140), the two schemes do not track one another word for word. The Ninth Circuit has concluded that an environmental impact statement "must be organized and written so as to be readily understandable by governmental decisionmakers and by interested non-professional laypersons likely to be affected by actions taken under [it]." (*Oregon Environmental Council* v. *Kunzman, supra,* 817 F.2d 484, 494.)

We find the standard articulated by the Ninth Circuit to be a sensible one, and comparable to that mandated by the California Guidelines. The requirement that EIRs be written in "plain language" so as to be comprehensible to decisionmakers and the public is set out in Guideline 15140. The document must contain, under Guideline 15123, a summary of the proposed action and its consequences. This summary is to be written in language which is as "clear and simple as reasonably practical." Guideline 15147 requires the EIR to include underlying technical detail so that the conclusions of the report can be evaluated by its reading audience. All technical data, however, need not be included in the body of report, but may ˙e relegated to appendices (Guideline 15147) or may be contained in separate source documents which are not formally a part of the document. (Guidelines 15148, 15150.) ■ The message of this regulatory scheme is clear: an EIR in this state must be written and presented in such a way that its message can be understood by governmental decisionmakers and members of the public who have reason to be concerned with the impacts which the document studies.

■ The fundamental question before us then, is, are these SEIRs legally inadequate because of the manner in which they are written or presented? SFRG maintains they are inadequate on several grounds. First, its argues, the SEIRs are poorly written. In support of its contention that the SEIRs are not models of lucid, expository prose, SFRG notes that Planning Commissioner Bierman was quite critical of language in several portions of the draft SEIRs. Indeed, the passages to which the commissioner objected include sentences and whole paragraphs written in such vague and opaque language as to be nearly meaningless. Does this badly written prose make

the documents incomprehensible? We think not. Commissioner Bierman was objecting to minor portions of a document which was almost 100 pages long. Despite her criticisms she did vote to certify them. We have no other indication that the decisionmakers were unable to understand the SEIRs. Thus, as a practical matter the SEIRs were written well enough to be understood.

### III.-VII.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

*Disposition*

We are unpersuaded that the trial court erred in discharging the writ.

The judgment is affirmed.

Benson, J., concurred.

**KLINE, P. J.**—I agree with the majority that the SEIRs involved in this case were comprehensible to the decisionmakers. I do not believe it necessarily follows from this, however, that members of the affected public were also able to comprehend the documents. I write separately to affirm my belief that each SEIR was indeed also "readily understandable . . . by interested non-professional laypersons likely to be affected by actions taken under [it]," as required by the Ninth Circuit standard we adopt (*Oregon Environmental Council* v. *Kunzman* (9th Cir. 1987) 817 F.2d 484, 494), and to clarify my views regarding application of that standard.

The Ninth Circuit test, like the guidelines that implement CEQA, require that the environmental impact statement be comprehensible not only to "decisionmakers" but as well to the affected public. (Cal. Admin. Code, tit. 14, §§ 15121, subd. (a), 15140.)[1] Though it is conceivable that an EIR will be incomprehensible to decisionmakers—i.e., elected and appointed government officials as well as civil servants involved in the authorization of construction projects—it is far more likely that the document will be incomprehensible, if at all, to the lay public. This greater likelihood arises not only from the fact that many people are unfamiliar with the jargon sometimes

---

\* See footnote, *ante,* page 1544.

[1] All subsequent citations to CEQA Guidelines refer to chapter 3 of title 14 of the California Administrative Code.

employed in environmental impact analysis, but as a result of the technical complexity inherent in some advanced forms of environmental analysis. For example, a water or ambient air quality test may involve elaborate chemical analyses beyond the ken of even the well educated.

It will often be appropriate to employ complex scientific theories or techniques in an EIR. The requirement that the document be "readily understandable . . . by interested non-professional laypersons," cannot be deemed to preclude the use of such complex concepts, for then environmental analysis would have to be carried out without the benefit of many of the most useful ideas and techniques, to the detriment of those the analysis is supposed to enlighten. Fortunately, the conflict that may arise between the need to employ sophisticated scientific methods and the duty to communicate to scientifically unsophisticated people does not present an insoluble dilemma. A scientific theory or complicated analytic technique beyond the understanding of the average layperson may be employed in an EIR provided an effort is made to describe it as simply as possible and enough information is supplied to enable a qualified person to test the theory or technique. The portions of the EIR that must without compromise be understandable by the lay public are those which describe the project (CEQA Guidelines, § 15124) and which summarize (1) each significant environmental effect of the project together with proposed mitigation measures and alternatives that would reduce or avoid adverse effects; (2) known areas of controversy, including issues raised by public agencies and the public; and (3) unresolved issues, including the choice among alternatives and whether or how to mitigate significant adverse environmental effects. (CEQA Guidelines, § 15123.)

In the present case the portions of the SEIRs that are most difficult to understand are those that describe and employ two different analytical approaches to forecast land use change, employment growth, and residence patterns between 1984 and 2000, i.e., the assessment of "cumulative impacts." These two approaches are referred to as the "Downtown plan forecast" and the "list-based approach." The description of these two approaches set forth in the SEIRs[2] and the manner in which they are applied, however, are not so recondite or complex as to be incomprehensible to most members of the public willing to take the time to read the documents.

---

[2] As stated in each SEIR, the basic general difference between these two approaches "is that the Downtown Plan approach accounts for changes to a range of land uses as well as changes over time in worker characteristics and behavior, while the list-based approach is limited to known projects of certain types and assumes unchanging characteristics and behavior. These two approaches are alternative means of assessing the future cumulative context for downtown development. They use different available data sources and different assumptions."

Moreover, the conclusions that result from their use are very easily understood. For example, under the highlighted heading "SIGNIFICANT ENVIRONMENTAL EFFECTS THAT CANNOT BE AVOIDED IF THE PROJECT IS IMPLEMENTED," the SEIRs all state the summary conclusion that although "cumulative impacts on energy use and housing demand have been mitigated to a level of insignificance . . . . [t]he project would be part of a trend of denser development in downtown San Francisco. The project would contribute to cumulative traffic increases on downtown streets and on freeways and bridges near downtown San Francisco, and would contribute to cumulative passenger loading impacts on Muni, BART and other transit carriers. Mitigation measures are available which would reduce these effects on a system-wide basis; these mitigation measures could be implemented by the City and County of San Francisco and other agencies wi·h jurisdiction over highways, bridges and transit systems but could not be implemented by individual project sponsors."

It does not require a degree in city planning to understand this summary of the information provided in greater detail in the body of each SEIR; and it succinctly provides the crucial information of greatest interest to most who consult the documents.

Where, as here, the environmental impact report describes as clearly as possible the factual assumptions and analytical techniques relied upon and simply and succinctly summarizes the most critical information, the standard of comprehensibility we adopt in this case has in my view been satisfied. As correctly pointed out in the CEQA Guidelines, "[t]he courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (CEQA Guidelines, § 15151; see also, *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 81 [198 Cal.Rptr. 634].)