[No. F011485. Fifth Dist. June 21, 1990.]

KINGS COUNTY FARM BUREAU et al., Plaintiffs and Appellants,
v.
CITY OF HANFORD et al., Defendants and Respondents;
GWF POWER SYSTEMS COMPANY, INC., et al., Real Parties in Interest.

[Opinion certified for partial publication.*]

\* Pursuant to California Rules of Court, rules 976 (b) and 976.1, this opinion is certified for publication with the exception of part I; subsections 2 and 4 of subdivision B of part IV; part VI; subsections 2 and 3 of subdivision C of part VII; subdivision B of part VIII; and subdivision B of part XI.

COUNSEL

Remy & Thomas, Michael H. Remy, James G. Moose, Shute, Mihaly & Weinberger, E. Clement Shute, Jr., Alletta d'A. Belin, Harriman & Gabrielli and Richard L. Harriman for Plaintiffs and Appellants.

No appearance for Defendants and Respondents.

Latham & Watkins, Christopher W. Garrett, Karna J. Peters and Philip G. Evans for Real Party in Interest.

OPINION

STONE (W. A.), J.—In this appeal we are called upon to determine the sufficiency of an environmental impact report (EIR) for a proposed 26.4-megawatt coal-fired cogeneration plant to be constructed in the City of Hanford (City). We are also asked to determine (1) the sufficiency of the evidence contained in the EIR to support the determination of the Hanford City Council that the proposed project would have no significant impact upon the environment and (2) whether the city council had authority to approve the project in light of the "Hanford General Plan" (General Plan), which appellants claim is defective.

Appellants are three associations: Kings County Farm Bureau, Kings County Citizens for a Healthy Environment, and Citizens for a Healthy

Environment. They challenge the EIR on several grounds, which we generally categorize as (1) the adequacy of the discussion of the impact of this project on the local environment with regard to air quality, water use and waste disposal, (2) the adequacy of the discussion of the cumulative impacts of this project and similar projects with regard to air quality, water use and waste disposal, (3) the adequacy of the discussion of alternatives to the proposed project, and (4) the adequacy of the project description. Because of the alleged inadequacy of the EIR, appellants contend there is no substantial evidence to support the determination by respondent Hanford City Council to certify the EIR as complete and to approve the project as proposed by real party in interest, GWF Power Systems Company, Inc. (GWF). Appellants also argue the General Plan is legally deficient with regard to land use, circulation and conservation elements, rendering approval of the project null and void.

Because we will conclude the EIR is inadequate because it contains insufficient information in several respects for the Hanford City Council to have made an informed decision whether to approve the project, we do not reach the question whether there is sufficient evidence to support the council's determination of no significant impact. We will also conclude the General Plan is insufficient to establish the city council's authority to approve the project.

Because of the large number of issues raised by appellants peculiar to the Hanford project and its EIR, we publish only those portions of this opinion dealing with principles that, in our estimation, have not been sufficiently addressed by prior cases, along with selected examples of how those principles apply to claimed deficiencies in the EIR.

FACTUAL AND PROCEDURAL BACKGROUND

*History of the Project*

In 1985 the Armstrong Tire and Rubber Company was on the verge of closing its Hanford plant, which would have caused the loss of approximately 600 jobs. As a result of negotiations, the employees and the company avoided a plant closure when workers agreed to wage concessions and Armstrong agreed to investigate locating a cogeneration facility next to the plant in order to reduce its second largest expense, energy. Cogeneration is the simultaneous production of thermal energy, such as steam, and electricity. In response to Armstrong's need for such a facility, GWF proposed building a cogeneration plant to be located next to the Armstrong plant. GWF purchased an adjacent 3.5-acre parcel from Armstrong for that purpose. The proposed plant would have the capacity for an average net pro-

duction of 19.9 megawatts of electricity and 35,000 pounds of steam per hour. GWF entered into an agreement to provide Armstrong with a minimum of 28.3 million pounds of steam per year, which would require the plant to supply steam to Armstrong approximately 34 days each year. The Public Utility Regulatory Policies Act of 1977 required Pacific Gas and Electric Company (PG&E) to purchase electricity produced by GWF at a fixed rate. Accordingly, GWF and PG&E entered into a 20-year "Power Sales Agreement."

### Project Description

The cogeneration project proposed would use a fluidized bed combustion system (FBC) which would burn 288 tons of low-sulfur coal per day in a bubbling bed of sand and limestone. The bubbling or churning effect of the system would be achieved by blowing air up through the bottom of the bed. The heat generated by the FBC would be used to convert water into high-pressure, super-heated steam which would be delivered by underground piping across the street to the Armstrong plant. The steam would also be used to produce electricity.

The system would emit particulate matter (dirt or dust particles), sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), carbon monoxide (CO), nonmethane hydrocarbons (NMHC), and trace metals. All of these elements are "affected pollutants" for which air quality standards have been set by the Environmental Protection Agency (EPA) or the California Air Resources Board (CARB). The source of particulate matter is the coal, the limestone (also referred to as sorbent) and the ash-handling systems. GWF expects to eliminate 98 percent of the particulate matter by covering the trucks which deliver the coal and limestone, totally enclosing the conveyance network by which the coal and limestone are transported to the FBC system, and ventilating through a high efficiency fabric filter. The source of $NO_x$ and $SO_2$ is the FBC process. GWF proposes to reduce $NO_x$ by 85 percent by low combustion temperatures, low excess air combustion and the injection of ammonia. Injection of limestone into the FBC system would control 94.7 percent of the $SO_2$ pollution. GWF expects control of CO, NMHC and trace metals from "extremely high combustion efficiency."

Coal for the project would be delivered by train to a coal storage supply terminal outside Kings County. From the supply terminal the coal would be transported to Hanford in 25-ton, 5-axle, double trailer trucks and stored in a silo capable of handling a 4-day supply (1,200 tons). The project would require 16 truckloads per day.

GWF anticipates the project would use 382 to 444 acre-feet of water each year from the City's water system. Waste water generated by the project

would be processed through a treatment system for recycling into the cooling tower. The waste water that cannot be treated at the facility would be transported by an industrial water company to a treatment and disposal facility in Los Angeles.

The combustion process would produce approximately 32.5 tons of nontoxic, nonhazardous waste ash per day which GWF plans to sell to a commodities broker for use in the manufacture of cement or plasterboard. Any waste ash that cannot be marketed would be deposited in a landfill outside the Hanford area.

### Environmental Review Process

GWF submitted the first of several operational statements for the proposed cogeneration facility in June 1986, and a second statement in July. GWF also submitted a "Health Risk Assessment" concerning two proposed GWF facilities in Fresno County which are similar to the proposed Hanford facility. During the following three months several city departments submitted comments regarding the plant's use of chemicals and problems regarding air pollution, water pollution and use, and waste disposal. GWF submitted a "First Revised Operational Statement" in December 1986. The following month the Hanford City Manager's office filed a notice of intent to adopt a "Negative Declaration." The notice indicated that based upon the initial study, it had been determined that "the effects of the project, as described, would be mitigated to a point where clearly no significant, adverse impact on the environment would occur." Despite numerous objections to the negative declaration, including requests from the CARB, the California Attorney General and the Kings County Water District (KCWD) for the preparation of an EIR, the City approved the negative declaration on April 7, 1987.

KCWD ultimately withdrew its request for an EIR after entering into an agreement (mitigation agreement) pursuant to which GWF agreed to contribute financially to the water district's ground water recharge program. The Attorney General, the Citizens for a Healthy Environment and Agribusiness Advocates filed suits against the City for its failure to prepare an EIR. The parties settled the lawsuits when the City agreed to prepare an EIR.

The City hired Dames & Moore, an environmental consulting firm, to assist in the preparation of the EIR. The draft EIR (DEIR), released October 16, 1987, concluded the project would have no significant adverse effect on the environment. During the public comment period, state agencies, private business interests, citizens groups, and private individuals comment-

ed on and objected to the DEIR. The final EIR incorporates these comments and responses to them.

City staff submitted the EIR to the Hanford City Planning Commission on February 9, 1988,[1] and recommended that the commission certify it as complete. The planning commission initially referred the project back to Dames & Moore for additional information regarding the use of natural gas as an alternative fuel, recalculation of project emissions taking into consideration pollutants from truck and train traffic associated with the project, consideration of requiring Armstrong to purchase its steam from GWF during the worst air pollution season, July through October, clarification of the calculations regarding water use, and clarification of calculations for mercury emissions. On March 8, 1988, the planning commission refused to certify the EIR.

City staff submitted the EIR to the city council on March 15, 1988. Despite criticism from the Attorney General's office, the California Energy Commission, the Tulare County Farm Bureau, the Kings County Farm Bureau, KCWD and numerous members of the public, the city council unanimously certified the EIR as complete. By a vote of three to two, the council determined the project would have no significant effect on the environment and approved the project.

NONCOMPLIANCE WITH CALIFORNIA ENVIRONMENTAL QUALITY ACT
(CEQA)

PART I*

*Exhaustion of Administrative Remedies*

. . . . . . . . . . . . . . . . . . . . . . . .

PART II

*The Purpose of CEQA*

The Legislature, in enacting CEQA, determined the preservation of a quality environment to be a matter of statewide concern. (Pub. Resources Code, § 21000, subd. (a).) It mandated all state agencies to give "major

---

[1] The transmittal letter bears the date "February 9, 1987." However, since the letter refers to events that occurred later in 1987, we assume the correct date was February 9, 1988.

* See footnote, *ante,* page 692.

consideration" to preventing environmental damage when regulating activities affecting the quality of the environment. (Pub. Resources Code, § 21000, subd. (g).)

Under CEQA, governmental agencies must "consider qualitative factors as well as economic and technical factors and long-term benefits and costs, in addition to short-term benefits and costs and . . . consider alternatives to proposed actions affecting the environment." (Pub. Resources Code, § 21001, subd. (g).) CEQA and its guidelines (Cal. Code Regs, tit. 14, § 15000 et seq. (hereinafter Guidelines)) outline a comprehensive scheme for evaluating potential adverse environmental effects.

CEQA requires the lead agency to certify the final EIR as complete and in compliance with CEQA and to consider the information contained in the final EIR before approving the project. (Guidelines, § 15090.) Before approval, the agency must make findings for each significant effect identified in the EIR. (Guidelines, § 15091.) It must either (1) find the project's significant adverse environmental effects have been avoided or lessened by alternatives or mitigation measures, or, (2) if it finds the alternatives or mitigation measures are infeasible, adopt a statement of overriding considerations, giving specific reasons why the project's benefits outweigh the unmitigated effects. (Pub. Resources Code, §§ 21002, 21002.1, 21081; Guidelines, §§ 15091-15093.)

PART III

*Scope and Standard of Review*

■ The final decision on the merits of a project is the responsibility of the lead agency. (*Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1021 [192 Cal.Rptr. 325].) ■ Although the purpose of CEQA is to compel government at all levels to make decisions with environmental consequences in mind, "CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].)

■ The court's inquiry in an action to set aside an agency's decision under CEQA extends only to whether the agency committed a prejudicial abuse of discretion. In this regard, although a court does not pass upon the correctness of an EIR's environmental conclusions, it does determine whether the EIR is sufficient as an informational document. (Pub. Resources Code, § 21168.5; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392, 407 [253 Cal.Rptr. 426,

764 P.2d 278]; *City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1447 [263 Cal.Rptr. 340]; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].)

Certain basic principles regarding the adequacy of an EIR are relevant to much of our discussion of the various issues. We will not repeat them in our analysis of each issue. An adequate EIR must be "prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences." (Guidelines, § 15151.) ■ It "must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at p. 405.)

■ CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive. (Guidelines, § 15151.) ■ Although disagreement among experts does not render an EIR inadequate, the report should summarize the main points of disagreement. (*Ibid.*) ■ The absence of information in an EIR, or the failure to reflect disagreement among the experts, does not per se constitute a prejudicial abuse of discretion. (Pub. Resources Code, § 21005.) A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at pp. 403-405.)

PART IV

*Air Quality Impacts*

A. *Adequacy of the EIR Regarding Impacts of the Specific Project on Air Quality.*

The "Air Quality" section of the DEIR begins with a brief overview of the state and federal regulations which govern the facility. First, the project is subject to the "New Source Review" regulations of the Kings County Air Pollution Control District (KCAPCD). Since under these regulations the proposed cogeneration plant is a new stationary source with the potential to emit $NO_x$ and $SO_2$ at a rate exceeding 150 pounds per day and CO at a rate exceeding 550 pounds per day, it must use the best available control technology, frequently referred to as "BACT." If the emission levels for $NO_x$ or $SO_2$ were to reach a rate exceeding 250 pounds per day, applicable regula-

tions would require emission offsets for these pollutants.[2] In the alternative, according to the regulations, if an emission exceeds threshold levels, the applicant can demonstrate through modeling that the emission would not violate or jeopardize any existing ambient air[3] quality standard. Although the EIR projected the level of CO emissions from the proposed plant to exceed the offset threshold level for that pollutant of 550 pounds per day, GWF demonstrated the emission of CO would not violate or jeopardize existing ambient air quality standards. Therefore, offset was not required.[4]

In addition, the facility is regulated by the EPA through the administration of prevention of significant air quality deterioration (PSD) review. Since the cogeneration project is considered a major source of criteria pollutants which exceed designated levels under PSD regulations, a PSD permit could only be obtained after GWF demonstrated BACT would be used, air quality impacts would not exceed allowable air quality increments or applicable federal air quality standards, visibility in class I areas (such as national parks) would not be adversely affected, and soils and vegetation of commercial or recreational value would not be significantly affected. The EPA issued a PSD permit for the proposed project on January 28, 1987.

Since the project is a fossil fuel-fired steam generator and an "industrial-commercial-institutional steam-generating unit," the federal new source performance standards apply. Compliance with these regulations for emissions of $SO_2$, $NO_x$ and particulate matter (PM) is expected to be achieved through the use of BACT.

According to the DEIR, not all relevant data regarding air quality in the Hanford area is available, but what is available reflects current ambient levels for ozone and fine particulate matter ($PM_{10}$)[5] exceed applicable state and federal standards for ambient air quality. The DEIR recognizes the pollutant responsible for 98 percent of all damage to agricultural crops in the San Joaquin Valley is ozone. Ozone results from the interaction between reactive organic compounds such as NMHC and $NO_x$. A 1987 CARB study

---

[2] "Offset" means the project must provide reductions of the emission in question at or close to the source in accordance with designated offset ratios.

[3] "Ambient air" is defined in EPA regulations as "that portion of the atmosphere, external to buildings, to which the general public has access." (40 C.F.R. § 50.1(e) (1989).) Ambient air quality levels or standards are to be distinguished from "emission" levels or standards. The relevant inquiry in these circumstances is the extent to which project emissions contribute to ambient, or already existing, air pollution.

[4] Appellants have requested that we take judicial notice of documents which reflect that just prior to certification of the EIR and approval of the GWF project, KCAPCD considered lowering its offset thresholds. These documents are not properly the subject for judicial notice since they do not reflect an official act of the district. Therefore, we deny the request.

[5] Particulate matter of 10 microns or less is considered most likely to be respired deep into the lungs.

estimated the 1984 statewide crop loss from excessive ozone levels was $100 million.

The report divides emissions during normal operation into two categories—on-site emissions, which result from fuel and material handling as well as fuel combustion; and secondary emissions, which result from employee traffic, delivery truck traffic, train delivery of coal and coal handling facilities. The on-site emission rates reflect levels estimated after calculating mitigation measures or BACT.

The figures used in comparing the project's impacts on air quality with state and federal ambient air quality standards indicate emissions of $SO_2$, $NO_2$,[6] and CO would not cause a violation of these standards.

The facility's impact upon ambient ozone levels in the area was not modeled. However, the DEIR concludes the project's contribution to ozone levels would be minor based upon (1) a comparison of the project's emissions of precursors to ozone ($NO_x$ and NMHC), which are relatively small when compared with regional emissions of the same precursors, and (2) evidence the emissions of $NO_x$ would not exceed KCAPCD offset thresholds. Likewise, since the emission levels for $SO_2$ and $NO_x$ are minor when compared to total regional emissions of $SO_2$ and $NO_x$, the DEIR concludes the project's impacts on regional crop damage would be insignificant.

Regarding ambient $PM_{10}$, the figures indicate the project would cause a 1 to 2 percent increase. However, the DEIR asserts the $PM_{10}$ emission level comparison conservatively assumes that all particulate matter emitted by the project is $PM_{10}$, whereas the actual $PM_{10}$ levels would be less than the amount considered in the comparison and would not constitute a measurable increase in concentrations. Accordingly, the DEIR concludes the facility's contribution to ambient $PM_{10}$ levels would be insignificant.

With regard to impacts from secondary emissions, the DEIR states: "Secondary emissions comprise an extremely small percentage of region-wide emissions. These emissions would be primarily transportation-related and would be spread over the entire haul distance. For these reasons, they would not result in significant impacts."

At the first hearing, the planning commission asked Dames & Moore to reevaluate its findings, and suggested in particular that the calculations

---

[6] $NO_2$ is the chemical symbol for nitrogen dioxide. $NO_2$ is the secondary air contaminant for which standards have been adopted. Nitrogen oxides ($NO_x$) are precursor air contaminants directly emitted from a source which form, cause to be formed or contribute to the formation of $NO_2$, ozone or the nitrate fraction of suspended PM in the atmosphere.

concerning emissions from the project should consider the uncontrolled secondary emissions from additional truck and rail traffic generated by the project.

Dames & Moore failed to do so, stating by written response: "The Kings County Air Pollution Control District Rules and Regulations do not require that secondary emissions be considered when assessing emission offset threshold levels. For information purposes, Dames & Moore contacted South Coast Air Quality District (SCAQMD) personnel to clarify how secondary emissions were considered in the Los Angeles air basin. The SCAQMD only considers dedicated in-plant vehicle/sources when assessing the offset threshold level. The SCAQMD does not include worker vehicles, trucks, or train emissions when assessing the offset threshold level. Mobile sources (particularly cars and trucks) are controlled using State and Federally mandated mobile emission control standards.

"Table 4 shows a comparison of the daily indirect project emissions within Kings County in relation to the total daily emissions for Kings County from all other sources. It is shown that emissions of any pollutant are less than 0.20 percent of the total Kings County emissions. These emissions, being from mobile sources are dispersed throughout the county and would not be concentrated in one single point. These indirect emissions are also much less than the direct project emissions which have been demonstrated to not significantly impact air quality. Therefore, it is concluded that project specific indirect emissions would not cause a significant impact in the Hanford area."

At a hearing before the city council, a member of the public asked why the report did not recommend offsets since the combination of stack emissions and secondary emissions exceeds offset thresholds. Mr. Kuebler of Dames & Moore responded: "Because the secondary emissions are considered when you consider the threshold level in this project . . . .

"Those are the ways the rules are written right now, and as I stressed before, the secondary emissions are already taken into consideration with this new source review rule, probably. The air resources board took a close look at questions just like you're asking, sir.

" . . . . . . . . . . . . . . . . . . .

"And your federally and state mandated mobile source control programs that have to be controlling the emissions of NOx and hydrocarbons from mobile sources."

Appellants attack several aspects of the EIR's consideration of the air quality impacts of the project.

1. *Separation of On-site and Secondary Emissions.*

According to appellants, the EIR is inadequate because the separation of on-site or stack emissions from off-site or secondary emissions associated with the project skews the analysis of the project's impacts. GWF contends the report is adequate because it evaluates and quantifies both on-site and secondary emissions, albeit separately. ■ GWF relies on the issuance by both the KCAPCD and EPA of the necessary permits for construction of the plant in order to invoke the presumption set forth in Guidelines, section 15064, subdivision (i) of no significant impact if air emissions meet existing standards. However, reliance upon this presumption assumes several things, none of which is supported by the record.

First, it assumes all project-related emissions are measured by the relied-upon standards. There is no evidence the EPA considered secondary emissions in determining whether to issue a PSD permit. KCAPCD rules and regulations apply only to stationary sources—in this case, stack emissions. Emissions from mobile sources, such as truck and train traffic, are expressly exempt from consideration. (See KCAPCD Rules and Regulations, rule 210.1.) GWF assumes CEQA similarly allows for the separation of stack emissions from truck and train emissions in determining whether the project will have a significant impact on air quality. GWF is mistaken.[7]

KCAPCD rules and standards are designed to measure pollution emissions from more narrowly drawn sources, i.e., stationary sources. Thus, KCAPCD requires the division of a project into parts for purposes of review. CEQA, on the other hand, is designed to measure all project-related pollution emissions and prohibits the division of a project into parts for purposes of environmental review. (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at pp. 283-284; *Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 309 [248 Cal.Rptr. 352].) The requirements of CEQA cannot be avoided by chopping up a proposed project into bite-size pieces which, individually considered, might be found to have no significant effect on the environment. (*Orinda Assn.* v. *Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1171-1172 [227 Cal.Rptr. 688].) CEQA defines the term "project" broadly to encompass the "whole of an action, which has a poten-

---

[7] GWF points to table 4.4-8, "OPERATIONAL PHASE AIR EMISSIONS," which includes a combined figure for on-site and secondary emissions. They contend this figure reflects that on-site and secondary emissions were combined for consideration. However, there is no *analysis* of the meaning of this figure in terms of the potential significance of project emissions.

tial for resulting in a physical change in the environment, directly or ultimately, . . ." (Guidelines, § 15378, subd. (a).)

The project requires the delivery of coal for fuel. The resulting emissions from truck or train traffic are related to the project and cannot be ignored when determining whether air emissions meet existing standards for purposes of invoking the presumption of no significant impact. Therefore, although it is accurate to describe emissions as coming from separate sources, it is inaccurate and misleading to divide the project's air emissions analysis into on-site and secondary emissions *for purposes of invoking the presumption the project will have no significant impact.*

We do not mean to suggest that the EIR must combine on-site and secondary emissions to measure against KCAPCD's offset levels for stationary sources. This would also be a misuse of the offset levels. The point is that the fact that on-site emissions alone and secondary emissions alone do not exceed KCAPCD's offset levels cannot properly be used to invoke the presumption that the project will have no significant impact on air quality. By the same token, the fact that on-site and secondary emissions combined would exceed KCAPCD's offset levels cannot be used to invoke the presumption that the project will have a significant impact on air quality. The manner in which KCAPCD's offset levels were used in the EIR provided an inaccurate and misleading analysis of the project's impact on air quality.[8]

2. *$PM_{10}$ Analysis.*

▉ The EIR's discussion of impacts of the project on air quality erroneously states current ambient levels for $PM_{10}$ exceed applicable state *and* federal standards. The figures establish the current ambient level of $PM_{10}$ is lower than the federal standard. Only the state standard is currently violated. According to the figures provided, the addition of $PM_{10}$ emissions attributable to on-site facility operations would result in a violation of the federal standard. Thus, even without the consideration of related secondary emissions of $PM_{10}$, the project would cause a violation of an air standard within the meaning of the Guidelines. The EIR is misleading in this respect.

Furthermore, since the figures for $PM_{10}$ used in comparing project emissions with state and federal ambient air quality standards do not include

---

[8] While it seems only logical that all air pollution emissions from a project, whether direct or indirect, must be considered together for purposes of analyzing the potential environmental impact of those emissions, we do not presume to impose upon the preparers of the EIR a mandatory scientific method for analyzing the effects of a project's air pollution emissions. If the acceptable scientific method of analysis precludes combining direct and indirect emissions, this court cannot impose a legal standard to the contrary. However, the fact that KCAPCD's rules measure only on-site emissions, does not, ipso facto, justify the separation of project emissions into pieces.

secondary emissions related to the project, the comparison is misleading.[9] The misleading nature of the discussion and the failure to include relevant evidence regarding secondary emission levels of $PM_{10}$ related to the project renders the EIR inadequate as an informational document.

### 3. *Ozone Analysis.*

 The DEIR concludes the project's contributions to ozone levels in the area would be immeasurable and, therefore, insignificant because the plant would emit relatively minor amounts of precursors compared to the total volume of precursors emitted in Kings County. The EIR's analysis uses the magnitude of the current ozone problem in the air basin in order to trivialize the project's impact. In simple terms, the EIR reasons the air is already bad, so even though emissions from the project will make it worse, the impact is insignificant.

The point is not that, in terms of ozone levels, the proposed Hanford project will result in the ultimate collapse of the environment into which it is to be placed. The significance of an activity depends upon the setting. (Guidelines, § 15064, subd. (b).) The relevant question to be addressed in the EIR is not the relative amount of precursors emitted by the project when compared with preexisting emissions, but whether any additional amount of precursor emissions should be considered significant in light of the serious nature of the ozone problems in this air basin.

Furthermore, as with the discussion of $PM_{10}$ emissions, the analysis of the project's emission of precursors to ozone ($NO_x$ and NMHC) is misleading because the calculations do not include secondary emissions related to the project.

The information and analysis regarding the significance of increases in ozone levels attributable to the GWF project is inadequate.

### B. *Adequacy of EIR Regarding Cumulative Impacts on Air Quality.*

#### 1. *Propriety of Standard for Assessing Significance of Cumulative Impacts on Air Quality.*

The DEIR's executive summary of the analysis of cumulative impacts on air quality states: "A cumulative impact analysis of mid-San Joaquin Valley

---

[9] Although table 4.4-8 "OPERATIONAL PHASE AIR EMISSIONS" includes a combined figure for the on-site and secondary PM, the figures used in table 4.4-14 to compare project emissions with state and federal air quality standards considers only on-site emissions.

energy projects shows that GWF projects would contribute less than one percent of area emissions for all criteria pollutants.

"The cumulative effect of the three GWF projects would not jeopardize attainment of nitrogen dioxide ($NO_2$), carbon monoxide (CO), or sulfur dioxide ($SO_2$) ambient air standards. Fine particulate matter ($PM_{10}$) and ozone standards are currently violated in the project area.

". . . Under CEQA, cumulative $PM_{10}$ impacts associated with proposed project may be considered potentially significant.

". . . . . . . . . . . . . . . . . . .

". . . Under CEQA, the cumulative ozone impacts of valley-wide energy development should therefore be considered potentially significant even though the actual increase in precursors emissions ascribed to these sources is small."

A comment from the public noted an inconsistency between the finding cumulative impacts with regard to $PM_{10}$ and ozone must be considered potentially significant and the conclusion there is no significant impact.

In response, the final EIR states in relevant part: "This EIR contains a discussion of possible cumulative impacts on air quality considering current ambient air quality levels and possible future projects in combination with the Hanford project. The fact that a variety of expected future projects in the cumulative impacts analysis may, in combination, result in a substantial increase in $PM_{10}$ or ozone precursor emissions does not automatically mean that any individual project must be classified as having a significant adverse effect under CEQA . . . . A question must still be answered as to whether the *incremental effects of an additional project* are considerable when viewed in connection with the effects of other projects. In this case, the EIR has reached the conclusion that incremental effects of the project studied by the EIR are not significant, even though the cumulative ozone impacts of Valley-wide energy development might be considered substantial."

Guidelines section 15355 states: "'Cumulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts.

"(a) The individual effects may be changes resulting from a single project or a number of separate projects.

"(b) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when

added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time."

 Appellants contend under the theory advanced in the EIR whenever an agency determines impacts specific to a particular project are not significant, corresponding cumulative impacts cannot be considered significant because the "incremental effects" of the individual project cannot be "considerable." They contend in assessing significance the EIR focuses upon the ratio between the project's impacts and the overall problem, contrary to the intent of CEQA. GWF contends the cumulative impacts analysis properly focuses upon the individual project's effects rather than the combined effects. According to GWF, the standard is defined by the use of the word "incremental," which means the analysis measures the amount by which the individual project adds to air quality problems, and since the project's emissions are relatively minor when compared with other sources, the EIR properly concluded the project would have no significant impact on air quality.

 We must interpret the Guidelines to afford the fullest possible protection to the environment. (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259-260 [104 Cal.Rptr. 761, 502 P.2d 1049].) One commentator has addressed the purpose of the cumulative impacts analysis: "One of the most important environmental lessons evident from past experience is that environmental damage often occurs incrementally from a variety of small sources. These sources appear insignificant, assuming threatening dimensions only when considered in light of the other sources with which they interact. Perhaps the best example is air pollution, where thousands of relatively small sources of pollution cause a serious environmental health problem.

"CEQA has responded to this problem of incremental environmental degradation by requiring analysis of cumulative impacts. Because of the critical nature of this concern, courts have been receptive to claims that environmental documents paid insufficient attention to cumulative impacts. For example, in *San Franciscans for Reasonable Growth*, [*San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61] the court stated that absent meaningful cumulative analysis, there would never be any awareness or control over the speed and manner of downtown development. Without that control, 'piecemeal development would inevitably cause havoc in virtually every aspect of the urban environment.'

"This judicial concern often is reinforced by the results of cumulative environmental analysis; the outcome may appear startling once the nature of the cumulative impact problem has been grasped." (Selmi, *The Judicial Development of the California Environmental Quality Act* (1984) 18 U.C. Davis L.Rev. 197, 244, fn. omitted.)

▆▆▆▆▆ We agree with the foregoing assessment of a cumulative impacts analysis. We find the analysis used in the EIR and urged by GWF avoids analyzing the severity of the problem and allows the approval of projects which, when taken in isolation, appear insignificant, but when viewed together, appear startling. Under GWF's "ratio" theory, the greater the overall problem, the less significance a project has in a cumulative impacts analysis. We conclude the standard for a cumulative impacts analysis is defined by the use of the term "collectively significant" in Guidelines section 15355 and the analysis must assess the collective or combined effect of energy development. The EIR improperly focused upon the individual project's relative effects and omitted facts relevant to an analysis of the collective effect this and other sources will have upon air quality.

2. *Use of BACT to Mitigate Cumulative Impacts.**

. . . . . . . . . . . . . . . . . . .

3. *Scope of Cumulative Impacts Analysis.*

Prior to the preparation of the DEIR, in response to a letter requesting suggestions regarding the scope and content of the draft report, CARB recommended the EIR's analysis of cumulative impacts should encompass the entire San Joaquin Valley Air Basin. Respondent subsequently agreed. However, the DEIR's analysis encompasses only the mid-San Joaquin Valley. In commenting on the DEIR, CARB did not complain that the cumulative impacts analysis was more limited in scope than had been agreed. In fact, CARB stated "Our previous concerns about cumulative impacts . . . have been addressed." However, a letter from the Attorney General's office regarding an EIR prepared for a GWF project in Fresno County was presented to the Hanford Planning Commission. The letter criticizes the limited scope of the analysis and states no justification appears for limiting the projects considered to the midvalley area, in light of the approximately 116 cogeneration plants planned for the San Joaquin Valley.

Appellants contend the EIR improperly limited the scope of the cumulative impacts analysis. They cite Guidelines section 15130, which provides in

* See footnote, *ante,* page 692.

part: "(b) The discussion of cumulative impacts shall reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided of the effects attributable to the project alone. The discussion should be guided by the standards of practicality and reasonableness. The following elements are necessary to an adequate discussion of cumulative impacts:

"(1) Either:

"(A) A list of past, present, and reasonably anticipated future projects producing related or cumulative impacts, including those projects outside the control of the agency, or

"(B) A summary of projections contained in an adopted general plan or related planning document which is designed to evaluate regional or area-wide conditions. . . .

"(2) A summary of the expected environmental effects to be produced by those projects with specific reference to additional information stating where that information is available, and

"(3) A reasonable analysis of the cumulative impacts of the relevant projects . . . ."

Appellants contend the question whether the scope of the cumulative impacts analysis was unduly narrow presents an issue of law. They also contend the court must interpret the Guidelines to afford the fullest possible protection to the environment within the reasonable scope of their language, relying upon *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 74 [198 Cal.Rptr. 634].

GWF asserts the determination of the scope of the analysis is, in essence, a question of fact to be determined by the lead agency and the court must conclude the EIR was adequate unless the analysis omitted important information. In making this determination, according to GWF, a court cannot look outside the record and must find the EIR to be adequate if there is any substantial evidence to support the scope chosen by the agency. They also cite *San Franciscans for Reasonable Growth* v. *City and County of San Francisco, supra*, 151 Cal.App.3d 61. The evidence which GWF contends supports the scope chosen by the agency is the statement of a representative of Dames & Moore that the counties excluded from the analysis were

outside the area expected to be affected by the project.[10] Since there is no evidence the failure to include the northern and southern portions of the valley in the analysis led to any serious understatement of the cumulative impacts, GWF claims we must find the EIR adequate.

In *San Franciscans for Reasonable Growth* v. *City and County of San Francisco, supra*, 151 Cal.App.3d 61, appellant claimed the scope of a cumulative impacts analysis was unduly limited because it did not take into consideration high rise office buildings similar to that proposed by the applicant, but which were still in the planning stages. The court held it was an abuse of discretion not to include unbuilt projects which were under review in the cumulative impacts analysis. The primary determination is whether it was reasonable and practical to include the projects and whether, without their inclusion, the severity and significance of the cumulative impacts were reflected adequately. (151 Cal.App.3d at pp. 74-77.) "The disparity between what was considered and what was known is the basis upon which we find an abuse of discretion." (*Id.* at p. 77.)

" . . . [I]t is vitally important that an EIR avoid minimizing the cumulative impacts. Rather, it must reflect a conscientious effort to provide public agencies and the general public with adequate and relevant detailed information about them. (CEQA, § 21061.)" (151 Cal.App.3d at p. 79.)

 The Hanford City Council knew CARB considered it important to encompass the entire air basin in its cumulative impacts analysis. It also knew the Attorney General's office considered it vital to assess the impact of the proliferation of similar energy development in the entire air basin. The record reflects that the various air pollution control districts could supply the information regarding similar projects in the basin. Indeed, it appears "baseline emissions inventory data" for the entire air basin had been provided by CARB. Even more relevant information would have been available from the EPA, since the air basin has been under strict scrutiny for failure to satisfy federal air quality standards. Thus, the EIR could reasonably and practically have included such projects in its analysis.

The more difficult question is whether limiting the scope of the analysis to the mid-San Joaquin Valley results in an underestimation of the severity of the problem in the air basin. According to the Attorney General's letter, some 116 more projects in addition to those already in existence were

---

[10]GWF also contends CARB and the Attorney General's office agreed to a "protocol" for conducting the cumulative impacts analysis for air quality which was limited to the mid-San Joaquin Valley. The record does not support this contention. To the contrary, the letter to which GWF refers to support its claim reflects that it was agreed the analysis would cover "the San Joaquin Valley Air Basin as a whole."

planned for the valley. The DEIR contains a list of 30 energy projects in the mid-San Joaquin Valley alone, but provides no data for the total number of projects in the entire air basin.

Because the record does not provide information regarding similar energy developments in the San Joaquin Valley air basin, the agency could not, nor can we, determine whether such information would have revealed a more severe impact. Accordingly, the EIR is inadequate. To conclude otherwise would place the burden of producing relevant environmental data on the public rather than the agency and would allow the agency to avoid an attack on the adequacy of the information contained in the report simply by excluding such information.

 4. *Failure to Include Secondary Emissions in the Analysis of the Cumulative Impacts of the Three GWF Projects.**

. . . . . . . . . . . . . . . . . . . . . .

PART V

*Water Resources Impacts*

A. *Adequacy of the EIR Regarding Impacts of the Specific Project on Water Resources.*

Appellants challenge the adequacy of the EIR's analysis of groundwater impacts. They claim the calculations regarding City water use are based upon incomplete data regarding industrial and agricultural use and the analysis of groundwater impacts lacks an evaluation of the feasibility of the mitigation agreement between GWF and KCWD.

The project will be located in the Tulare Lake Basin, a subdivision of the San Joaquin Valley Ground Water Basin, the largest groundwater basin in California. The Tulare Lake Basin encompasses approximately 700 square miles located primarily in Kings County, with the City of Hanford in its northern portion. KCWD encompasses approximately 143,000 acres around the City of Hanford and operates its own wells. The City of Hanford encompasses approximately 10 square miles within the district.

The DEIR focuses on four aspects of groundwater resources—availability, withdrawal, quality and subsidence. Only two, availability and with-

_____

*See footnote, *ante*, page 692.

drawal, are of concern in this appeal. Regarding availability of ground-water, the DEIR concludes the project will have no significant impact because the maximum demand of GWF over the 20-year life of the project will be 8,800 acre-feet and the City's demand will be 226,000 acre-feet during that time, whereas the present water storage beneath the City is estimated at a minimum of 640,000 acre-feet.

In the section dealing with the project's impacts upon public services, the DEIR provides: "Facility water use would not significantly impact the City of Hanford, which receives its water from ground-water wells in the area. During 1986, the City of Hanford pumped a total of 8,571 acre-feet of water for use by the City system (McGlasson and Associates, 1987). The 444 acre-feet of water required for the project would increase the City's water usage by 5.2 percent to 9,015 acre-feet per year . . . . Although some authorities believe the ground-water basin to be in an over-draft condition, recent studies of wells monitoring the aquifers tapped by the City indicate that sufficient water would be available for the City's agricultural, residential, and industrial needs, including those of the proposed facility . . . ."

The DEIR concludes no mitigation measures are proposed "beyond the measures outlined in the project description" since the report identifies no significant impacts relating to water resources. The report does not outline mitigation measures in the project description with regard to the use of groundwater. However, it identifies several "project features" as "measures proposed to mitigate any adverse impacts" resulting from groundwater removal.

In commenting on the DEIR, the State Water Resources Board criticized the analysis as being based upon "short-term trends" in water levels resulting in an overestimation of surface water supply and an underestimation of overdraft conditions. The response stated, "The impact analysis considered a 94 year period of precipitation data to derive a conservative estimate for the length of an abnormally dry period which might affect the area." According to the response, the assumption, for purposes of analysis, of 10 consecutive abnormally dry years is conservative for assessing impacts.

In its comments, KCWD attacked as misleading and inaccurate the analysis and conclusions of the DEIR with regard to groundwater resources. The district asserted that without the mitigation agreement the project raises serious environmental concerns about water resources. According to KCWD, the DEIR fails to disclose the water use contemplated for the project's three-acre site is fifty times greater than the average water use on urban and agricultural lands of comparable size. From the district's perspective, the analysis of the DEIR masks the project's true impact on

groundwater resources by blending the project's use with all other City uses of water. According to KCWD the recharge activities of the City are not sufficient to mitigate the City's contributions to the area-wide groundwater overdraft. The district also criticized as irresponsible the DEIR's approach to groundwater availability. Finally, KCWD asserted the DEIR should acknowledge the mitigation agreement is essential to mitigate the adverse environmental consequences of the project to the point of insignificance and the agreement should be included as a condition of the project's approval.

In response to KCWD's comments, the EIR justifies the volume of water to be used by the project as typical for industrial projects, and only about half the typical use for agricultural acreage. The response states the City's current water use is 1.20 acre-feet of water per acre served, which will increase to only 1.26 acre-feet of water per acre served with the addition of the project. The response further asserts the City's recharge activities are effective in "enhan[cing] the water balance of the area" and the project would have an insignificant impact on groundwater resources even without the mitigation agreement with KCWD because (1) the average water level decline of 0.7 feet per year attributable to the project would be less than one-half of 1 percent of the available drawdown[11] in the average agricultural well; (2) the 0.7 feet per year decline is much less than the yearly fluctuations of 10 feet or more which commonly occur in the area; (3) City water use would still be less than half of agricultural water use per acre; and (4) City groundwater recharge programs will mitigate the impacts of the project.

The EIR contends it is irrelevant the project may contribute to groundwater overdraft conditions since sufficient groundwater is available to meet the City's needs and the project's needs over the 20-year life of the project, even assuming no recharge.

1. *The EIR's Analysis of Industrial and Agricultural Water Use.*

 At the first hearing before the city planning commission concerning the project EIR, a conflict arose between the testimony of representatives of KCWD and Dames & Moore regarding the volume of water used in the City of Hanford. According to KCWD, the data in the DEIR underestimated total City water consumption by nearly one-half because it did not include all agricultural and industrial water uses. The planning commission delayed action on the project and referred the EIR back to Dames & Moore for clarification in light of the contradictory calculations from KCWD. In

---

[11] Drawdown is the distance from the water table to the pump inlet in a well.

response, Dames & Moore revised its estimates of groundwater use upward over the 20-year life of the project.

Appellants contend the EIR is incomplete and, therefore, legally deficient under CEQA because it did not include accurate data regarding agricultural and industrial water use over the project lifetime. They rely upon *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 706 [104 Cal.Rptr. 197], which states: "[i]t should be understood that whatever is required to be considered in an EIR must be in that formal report; what any official might have known from other writings or oral presentations cannot supply what is lacking in the report." However, as stated in *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 285 [152 Cal.Rptr. 585]: " ' "[I]t is doubtful that any agency, however objective, however sincere, however well-staffed, and however well-financed, could come up with a perfect environmental impact statement in connection with any major project. Further studies, evaluations and analyses by experts are almost certain to reveal inadequacies or deficiencies. But even such deficiencies and inadequacies, discovered after the fact, can be brought to the attention of the decision-makers, . . ." ' [Citations.]"

Whether or not the EIR's discussion of groundwater impacts included accurate data regarding agricultural and industrial water use by the City, the claimed deficiencies in the data were before the planning commission. Both the public and the agency had the opportunity to consider the alleged deficiencies and comment upon whether the analysis of City water use supported Dames & Moore's opinion the project would not significantly impact groundwater resources. The alleged inaccuracies did not render it difficult for the public or the city council to evaluate the EIR's discussion of groundwater impacts.[12]

Unlike the EIR's discussion of air quality impacts in which data regarding total emission levels was incomplete or inaccurate, the agency and public were adequately apprised of conflicting estimations of total City water use.

2. *Mitigation Agreement.*

■ Appellants urge the EIR is inadequate because it fails to evaluate whether water will be available for groundwater recharge as contemplated

---

[12] KCWD did not include in its formal comments to the DEIR any mention of contradictory data regarding City water use. Had this alleged deficiency been brought to the attention of the drafters of the report during the period of time statutorily prescribed for comments, presumably the final EIR would have addressed the conflicting data.

by the mitigation agreement between KCWD and GWF. They refer to a memo from the city public works director which states, in part: "The E.I.R. writers need to know that money does not constitute water recharge. Kings County Water District has a large capital reserve and cannot purchase enough water to bring into Kings County. They cannot find the additional water because it is not available. Money will not solve that problem."

They also refer to a memorandum to Dames & Moore from the administrative analyst for the City in which he suggests the DEIR should include "some evaluation as to whether the water is available for purchase." According to appellants, if the city council had been presented with evidence the mitigation agreement was meaningless in times of water shortages, it might not have approved the project.

GWF contends a study of possible sources of water for replenishment purposes was not necessary because the EIR concluded that even without replenishment project water use will not cause water use in the Hanford area to exceed expected groundwater supplies.

Appellants' contention assumes the mitigation agreement was, at least in part, a basis for finding no significant impact. GWF's contention assumes the mitigation agreement was, for the most part, irrelevant to the finding of no significant impact. Because the City made no specific findings concerning whether it considered the GWF-KCWD agreement to mitigate the effect of the project on groundwater, we cannot determine how the City viewed the agreement.

To the extent the GWF-KCWD agreement was an independent basis for finding no significant impact, the failure to evaluate whether the agreement was feasible and to what extent water would be available for purchase was fatal to a meaningful evaluation by the city council and the public.

B. *Sufficiency of the Analysis Regarding Cumulative Impacts on Water Resources.*

The EIR's discussion of cumulative project impact on water resources provides in part: "6.1.2 Cumulative Project Impact

"The cumulative impact on local and regional water resources must be evaluated in light of the overall water supply and demand in the San Joaquin Valley. While this and other nearby projects would place an additional demand on groundwater resources for the entire valley, the impact of the additional demand would be minor and mitigation measures have been

proposed which should reduce the impact on local and regional water supplies to an insignificant amount.

"The Hanford project would receive water from the City of Hanford municipal distribution system, which taps the ground-water reservoir through a series of water supply wells. The two GWF projects proposed in Fresno County (Monmouth and Kingsburg) would receive water from on-site wells. Total water demand from the three projects would require 780 to 877 gallons per minute (1146 to 1288 acre-feet per year).

". . . . . . . . . . . . . . . . . . . . .

"The proposed GWF projects, other energy projects in the valley and associated future population growth in the surrounding area would impact regional water resources, but these impacts would be lessened by numerous programs and project water conservation measures designed to assist in local groundwater recharge. . . .

". . . . . . . . . . . . . . . . . . . . .

"As a result of recharge programs, optimum design of energy projects and other water conservation measures described above, *there is not expect-ed to be any significant cumulative impacts* associated with water resources as a result of this project." (Italics added.)

▆▆▆ Appellants contend the discussion is inadequate because it fails to provide any information regarding the actual impact, such as how much water will be used by similar projects in the Tulare Lake Basin. Although comments to the DEIR raised the issue, the final EIR does not respond to this claimed inadequacy.

The Guidelines require that an adequate cumulative impacts analysis include a list of the projects producing related or cumulative impacts, a summary of the expected environmental impacts from those projects and a reasonable analysis of the cumulative impacts of the relevant projects. (Guidelines, § 15130.) The discussion in the EIR of cumulative impacts of energy developments similar to the GWF project contains no list of the projects considered, no information regarding their expected impacts on groundwater resources and no analysis of the cumulative impacts. It merely assumes whatever impacts such projects may have will be mitigated by existing and planned water conservation efforts of governmental agencies in the area.

Absent some data indicating the volume of groundwater used by all such projects, it is impossible to evaluate whether the impacts associated with

their use of groundwater are significant and whether such impacts will indeed be mitigated by the water conservation efforts upon which the EIR relies.

PART VI*

*Waste Disposal Impacts*

. . . . . . . . . . . . . . . . . . . . . .

PART VII

*Adequacy of Alternatives Analysis*

A. *The Effect of Alternatives Which Can Avoid or Substantially Lessen the Significant Impacts.*

Appellants cite Public Resources Code sections 21002 and 21081, Guidelines sections 15002, subdivisions (a)(3), (h)(4), 15021, subdivision (a), 15091, subdivision (a) and *Citizens for Quality Growth* v. *City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 443-445 [243 Cal.Rptr. 727], to support their contention CEQA forbids approval of a project when the EIR identifies one or more significant impacts which can be avoided or substantially lessened by proposed alternatives. We disagree. The authorities relied upon by appellants do not compel rejection of a project simply because certain alternatives would avoid identified significant impacts.

Public Resources Code section 21002 provides in part:

"The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, . . . The Legislature further finds and declares that *in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects* thereof." (Italics added.)

Guidelines section 15002, subdivision (a)(3) states one of the basic purposes of CEQA is to "[p]revent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or

---
*See footnote, *ante*, page 692.

mitigation measures when the governmental agency finds the changes to be feasible." Guidelines section 15021 establishes a duty for public agencies to avoid or minimize environmental damage when feasible.

CEQA does not require the lead agency to choose the environmentally best alternative identified in an EIR if (1) through the imposition of feasible mitigation measures identified in the report the environmental damage from a project can be reduced to an acceptable level (*Laurel Hills Homeowners Assn.* v. *City Council* (1978) 83 Cal.App.3d 515, 521 [147 Cal.Rptr. 842]), or (2) the agency finds specific economic, social or other considerations make alternatives infeasible. (Pub. Resources Code, § 21081, subd. (c).) Even though the agency ultimately finds mitigation measures adequate or proposed alternatives infeasible, the EIR must still contain a meaningful discussion of both alternatives and mitigation measures. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at pp. 403-404.) The determination to reject such alternatives or mitigation measures must be supported by recorded findings. (Pub. Resources Code, § 21081.)

Contrary to appellant's contention, *Citizens For Quality Growth* v. *City of Mt. Shasta, supra,* 198 Cal.App.3d 433, did not hold CEQA compelled adoption of one of the alternative projects if it would avoid the identified environmental damage. It merely required the agency to weigh the feasibility of the proposed alternatives and to make findings regarding feasibility. (*Ibid.*)

B. *Effect of Failure to Identify a Significant Impact.*

The City has two obligations. It is responsible for ensuring the EIR contains a meaningful discussion of alternatives and mitigation measures which would avoid or substantially lessen the environmental damage associated with the project as proposed, and, if it concludes the project will have one or more significant effects, it must make findings on the record regarding the feasibility of such alternatives. An inadequate discussion of alternatives constitutes an abuse of discretion. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at pp. 404-406.) Appellants contend the EIR contained an inadequate discussion of alternatives and the City failed to make the necessary findings.

GWF contends the discussion of alternatives need not be detailed when the EIR identifies no significant impact from the project as proposed, relying on Guidelines section 15126, subdivision (d)(3), which states in pertinent part: "The discussion of alternatives shall focus on alternatives capable

of eliminating any significant adverse environmental effects or reducing them to a level of insignificance . . . ."

According to GWF, there is a lower standard of sufficiency with regard to information about and analysis of alternatives when the EIR concludes the project will not result in significant impacts. GWF argues the level of specificity and detail depends upon whether the alternative being considered could potentially avoid or reduce environmental damage. If there is no environmental damage associated with the proposed project, alternatives need not be considered.

The project proponent made a similar argument in *Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* contending the EIR need not engage in an analysis of alternatives when mitigation measures have been identified. (47 Cal.3d at pp. 400-401.) The court stated such a view "ignores the chronology of the environmental review process under CEQA." (*Id.* at p. 401.)

"State agencies are required to certify the completion of an EIR 'on any project they propose to carry out or approve.' (§ 21100.) As a matter of logic, the EIR must be prepared before the decision to approve the project. Not until project approval does the agency determine whether to impose any mitigation measures on the project. (§ 21002.1, subd. (b).) One cannot be certain until then what the exact mitigation measures will be, much less whether and to what degree they will minimize environmental effects. According to the Regents, the decision to require mitigation measures on project approval removes the need to consider project alternatives in the EIR. The decision imposing mitigation measures, however is not made, and cannot be made under CEQA, until after the EIR has been completed. To adopt the Regents' view, would be to say that alternatives need not be discussed *if* there is a possibility that the agency might adopt mitigation measures. Such result would invert the chronology of the CEQA process." (47 Cal.3d at pp. 401-402.)

Similarly, to adopt GWF's view is to say alternatives need not be discussed if the agency might possibly find no significant impact. Although the lead agency has the authority to employ a private entity to prepare an environmental impact report, and those entities or persons may perform the functions necessary to meet the requirements of CEQA (Pub. Resources Code, § 21151.6), the decisionmaking body, not the report's preparer, is ultimately responsible for determining whether the proposed project will have a significant impact upon the local environment.

Therefore, we conclude if there is evidence of one or more potentially significant impacts, the report must contain a meaningful analysis of alternatives or mitigation measures which would avoid or lessen such impacts.

C. *Sufficiency of the Alternatives Analysis.*

An EIR must "[d]escribe a range of reasonable alternatives to the project or to the location of the project, which could feasibly attain the basic objectives of the project and evaluate the comparative merits of the alternatives." (Guidelines, § 15126, subd. (d).) The discussion must "focus on alternatives capable of eliminating any significant adverse environmental effects or reducing them to a level of insignificance, even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly." (Guidelines, § 15126, subd. (d)(3).) ■ A major function of the EIR is to ensure thorough assessment of all reasonable alternatives to proposed projects by those responsible for the decision. (*County of Inyo* v. *City of Los Angeles, supra*, 71 Cal.App.3d at p. 203.)

A legally adequate EIR "must produce information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned." (*San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738, 750-751 [202 Cal.Rptr. 423]; see also *Citizens of Goleta Valley* v. *Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1178-1181 [243 Cal.Rptr. 339].) It must contain sufficient detail to help ensure the integrity of the process of decisionmaking by precluding stubborn problems or serious criticism from being swept under the rug. (*Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 [231 Cal.Rptr. 748, 727 P.2d 1029]; *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 841 [115 Cal.Rptr. 67].) It must reflect the analytic route the agency traveled from evidence to action. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) An EIR which does not produce adequate information regarding alternatives cannot achieve the dual purpose served by the EIR, which is to enable the reviewing agency to make an informed decision and to make the decisionmaker's reasoning accessible to the public, thereby protecting informed self-government. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra*, 47 Cal.3d at p. 392.)

■ The degree of specificity required in an EIR depends upon the degree of specificity involved in the underlying activity described in the EIR. (Guidelines, § 15146.) ■ The sufficiency of the information contained in an EIR is reviewed in the light of what is reasonably feasible. (Guidelines, § 15151.)

1. *Natural Gas Alternative.*

Appellants contend the EIR should contain a comparative, quantitative analysis of the relative merits and environmental impacts of natural gas as

an alternative to the proposed coal project. They cite CARB data contained in a letter to a city council member which provides a comparison between stack emissions created by coal and stack emissions created by natural gas. In addition, they cite data found in the DEIR regarding secondary emissions from truck and train traffic associated with transporting coal to the project site that would be eliminated with the use of natural gas.

Appellants contend the failure to include the foregoing data precluded the City from making a meaningful assessment of the environmental merits of the two fuels.[13] They argue the additional data provides a more complete comparison between the emission levels associated with the two fuels, and, apparently, was readily available from CARB. Thus, under the standards for adequacy of an EIR set forth in Guidelines section 15151, it was an abuse of discretion not to include the data.

Public Resources Code section 21005 provides noncompliance with the information disclosure provisions of CEQA may constitute a prejudicial abuse of discretion. When the failure to comply results in a subversion of the purposes of CEQA by omitting information from the environmental review process, the error is prejudicial. (*Rural Landowners Assn.* v. *City Council, supra,* 143 Cal.App.3d at p. 1023.)

We conclude the discussion in the EIR in several respects omits substantial information about the use of natural gas, and the omissions subverted the purposes of CEQA. The council did not have before it an accurate comparison of the two fuels. The omissions constitute an abuse of discretion.

The DEIR characterizes the emission levels associated with natural gas as being "somewhat lower" than the emission levels associated with coal. Although the assessment is an accurate estimation of $NO_x$ levels, it seriously mischaracterizes the reductions in $SO_2$, CO and particulate matter levels. The DEIR recognizes natural gas would reduce or eliminate truck and train traffic associated with coal, ash, and sorbent transportation. However, in the absence of the relevant data regarding the emission levels associated with the truck and train traffic, the significance of their elimination is unknown.

GWF argues data contained in two tables appearing in the DEIR's cumulative impacts analysis regarding emission levels associated with other mid-San Joaquin Valley energy projects contains sufficient data regarding

---

[13] GWF contends appellants are barred from raising this defect on appeal since they did not raise it before the city council. However, a planning commissioner pointed out the defect at the hearing before the planning commission.

the emission levels of a natural gas plant to provide for meaningful assessment of the natural gas alternative. The first table concerns the ash production of mid-San Joaquin Valley energy projects, and although it identifies the fuel used at each plant, it does not contain data regarding emission levels. The second table concerns emission levels but does not identify the fuel used. These tables provide little, if any, assistance in assessing the relative merits of natural gas versus coal for the GWF plant in Hanford.

Dames & Moore conceded a significant reduction in water use with natural gas, but contended the use of water with the coal plant would not be significant. The report did not quantify the reduction. The absence of this comparative data renders the analysis of the natural gas alternative incomplete and precludes meaningful consideration of the natural gas alternative.

█ GWF contends the comments contained in the letter from Southern California Gas Company regarding the feasibility of the natural gas alternative provides sufficient additional information. Comments are an integral part of the EIR and should be relied upon by the decisionmakers. (*Residents Ad Hoc Stadium Com.* v. *Board of Regents, supra,* 89 Cal.App.3d at p. 286.) However, the comments contained in the letter do not provide the quantitative, comparative analysis missing from the EIR.

The Hanford Planning Commission rejected the EIR as inadequate with regard to its evaluation of the natural gas alternative and asked the preparers to consult with Southern California Gas Company on the matter. A written response to the planning commission stated in part: "GWF Power Systems, Inc. (GWF) began its initial evaluation of this project in September 1984. During this period, GWF evaluated numerous project fuel and technology alternatives. As reported to Dames & Moore by GWF, in late 1984 and early 1985 this project evaluation concluded the following:

"1) There were no long term natural gas carriage rates established by the California Public Utilities Commission (CPUC);

"2) Natural gas prices were relatively high and no long term supply contracts were available;

"3) An economically viable project with a stable fuel supply using natural gas could not be assured. In an independent assessment of long term fuel supply for its operations Armstrong Tire Company came to the same conclusions as stated above."

At the next planning commission meeting, Dames & Moore conceded it had not consulted with Southern California Gas Company, but it had con-

sulted with GWF and examined the conditions under which GWF had evaluated the alternatives. It admitted a long-term contract for natural gas was now possible, but asserted if GWF were to convert to natural gas at the present stage of development it would be unable to meet the terms of its contract with PG&E. The statement of John Robinson, a representative of Dames & Moore, reflects the approach to the evaluation of alternatives: "We've limited our investigation of alternatives to the alternative that the applicant concluded for the known project. If another applicant were to come before you with a gas fired project, then you would be free to consider that. I was not . . . considered for the project as service to the Armstrong Tire Company."

██ An environmentally superior alternative cannot be deemed infeasible absent evidence the additional costs or lost profits are so severe the project would become impractical. (*Citizens of Goleta Valley* v. *Board of Supervisors, supra*, 197 Cal.App.3d at p. 1181.) ██ Nor can an agency avoid an objective consideration of an alternative simply because, prior to commencing CEQA review, an applicant made substantial investments in the hope of gaining approval for a particular alternative. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra*, 47 Cal.3d at p. 425.)

Since CEQA charges the agency, not the applicant, with the task of determining whether alternatives are feasible, the circumstances that led the applicant in the planning stage to select the project for which approval is sought and to reject alternatives cannot be determinative of their feasibility. The lead agency must *independently* participate, review, analyze and discuss the alternatives in good faith. (*Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco* (1980) 106 Cal.App.3d 893, 908-910 [165 Cal.Rptr. 401].)

"The EIR must contain facts and analysis, not just the bare conclusions of a public agency. An agency's opinion concerning matters within its expertise is of obvious value, but the public and decision-makers, for whom the EIR is prepared, should also have before them the basis for that opinion so as to enable them to make an independent, reasoned judgment." (*Santiago County Water Dist.* v. *County of Orange* (1981) 118 Cal.App.3d 818, 831 [173 Cal.Rptr. 602].)

The applicant's reasons for deciding upon the project as proposed are merely a part of the evidence to be considered. The current circumstances must also be a part of the feasibility equation. ██ "The CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge

during investigation, evoking revision of the original proposal." (*County of Inyo* v. *City of Los Angeles, supra*, 71 Cal.App.3d at p. 199.) Otherwise, CEQA's mandate to consider alternatives would be meaningless.

■ At the time the lead agency engages in the review process, the applicant presumably has not begun construction or development. The applicant must anticipate, in the course of the review process, the lead agency may determine an environmentally superior alternative is more desirable or mitigation measures must be adopted. An applicant who proceeds with the project prior to the completion of the environmental review process in the expectation of certain approval runs the risk of incurring financial losses. Likewise, an applicant's choice to proceed in the face of pending review and the possibility the environmental review process will be found inadequate cannot render an alternative infeasible. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra*, 47 Cal.3d at p. 425.)

■ Similarly, although applicants may enter into contracts and agreements prior to the completion of the environmental review process, such contracts or agreements cannot be used to avoid the scrutiny envisioned by CEQA. Environmentally superior alternatives must be examined whether or not they would impede to some degree the attainment of project objectives. (Guidelines, § 15126, subd. (d)(3).)

The contract between PG&E and GWF is not irrelevant. It must be considered in the review process. However, it does not preclude consideration of otherwise feasible alternatives. Renegotiation of the contract may have been possible; if not, the EIR must indicate the reasons for that conclusion.

2., 3.*

. . . . . . . . . . . . . . . . . . . .

## PART VIII

### Adequacy of Project Description

A. *Project Lifetime.*

Appellants contend the EIR's analysis of environmental impacts erroneously assumes a 20-year, rather than a 30-year, project lifetime. They claim

---

*See footnote, *ante*, page 692.

as a result of this inadequate project description the impacts are underestimated by 50 percent. GWF contends the analysis assumes a 20-year project lifetime because the operation of the project is defined by the "Power Sale Agreement" with PG&E which will expire after 20 years.[14]

■ An accurate, stable and finite description of a project is basic to an informative and legally sufficient EIR. (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d at p. 193.) A curtailed or distorted description of the project may "stultify the objectives of the reporting process." (*Id.* at p. 192.) ■ Basic to environmental review is that it occur early enough in the planning stages of a project to enable environmental concerns to influence the project's program and design, yet late enough to provide meaningful information for environmental assessment. (Guidelines, § 15004, subd. (b).) ■ However, "where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences." (*Lake County Energy Council* v. *County of Lake* (1977) 70 Cal.App.3d 851, 854-855 [139 Cal.Rptr. 176].)

■ ■ ■ ■ The parties agree the test set forth by the Supreme Court in *Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, furnishes at least a starting point for the determination of whether the EIR's analysis of environmental impacts should have taken into consideration that the project might operate longer than 20 years. We conclude *Laurel Heights* requires an analysis of the environmental effects of future expansion or operation if there is credible and substantial evidence that (1) it is a reasonably foreseeable consequence of the initial project and (2) the future expansion or operation will likely change the scope or nature of the initial project or its environmental effects. (47 Cal.3d at pp. 396-398.)[15]

---

[14] GWF also contends Public Resources Code section 21177 precludes raising this issue because they did not claim in comments to the DEIR or before the city council that the EIR should have used a 30-year project description. Although inconsistencies between the 20-year assumed lifetime in the EIR's analysis of impacts, the "Health Risk Assessment's" assumption of a 30-year operational lifetime and the 25-year term of the mitigation agreement with KCWD were raised in comments, GWF contends these "general comments" merely deserved a "general response" and did not adequately apprise the City of the purported defect. (See *Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852, 862 [226 Cal.Rptr. 575].) Our review of the comments reveals they questioned why the EIR assumed a 20-year lifetime when there was evidence the plant would have a longer lifetime. The issue was adequately preserved for appeal.

[15] Despite GWF's assertion to the contrary, the manner in which the substantial evidence standard is applied in the foregoing test does not conflict with existing law. In reviewing the agency's ultimate conclusions regarding the significance of a project's environmental impacts, this court is bound by the agency's determination if it is supported by substantial evidence. We are not in this instance concerned with the ultimate findings of significance. We

"Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA." (47 Cal.3d at p. 396.)

GWF contends there is no evidence it plans to operate the facility beyond the 20-year life of the PG&E contract. They cite evidence PG&E was forced by the Public Utilities Commission to buy electricity from GWF despite unfair pricing and an "excess power dilemma," and since they cannot operate under existing law without a contract to sell electricity to PG&E, project operations will cease when the PG&E contract terminates.

Appellants cite the "Health Risk Assessment" contained in the EIR which assumes a 30-year operational lifetime in its analysis. In addition, the EIR recognizes in one of its responses the project has a "realistic operating period of 30 years," and although the "contractual operating life of the facility" is 20 years, "[t]he 30-year life [assumed in the 'Health Risk Assessment'] represents the practical, in-service lifetime of the equipment comprising the GWF facility . . . ." Appellants refer as well to the 25-year term of the mitigation agreement between GWF and KCWD.

 From our review of the record, we conclude although the facility may have the capacity to operate for 30 years, there is no credible and substantial evidence GWF plans to operate the project beyond the 20-year life of the PG&E contract. GWF and PG&E may agree to extend the life of the contract upon its expiration in 20 years, or another purchaser of electricity may be found. However, CEQA does not require discussion in an EIR of future developments which are unspecified and uncertain. Such an analysis would be based upon speculation about future environmental impact. If at some time GWF decides to operate the project beyond 20 years, a subsequent EIR will be necessary before such operation can be approved under CEQA. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra*, 47 Cal.3d at p. 396.)

B. *Coal Supply Terminal.**

. . . . . . . . . . . . . . . . . . . .

---

are concerned instead with the question of whether the EIR should include a discussion of future expansion or operation.

* See footnote, *ante*, page 692.

NONCOMPLIANCE WITH PLANNING AND ZONING LAWS

PART IX

*Exhaustion of Administrative Remedies*

■ Appellants failed to exhaust their administrative remedies with regard to their claim that approval of the project is a nullity because of a defective General Plan. The question is whether they are excused from raising the issue at the administrative hearing.

With regard to actions challenging local planning and zoning decisions, Government Code section 65009, subdivision (b)(1) provides, in relevant part: "In an action or proceeding to attack, review, set aside, void, or annul a finding, determination, or decision of a public agency made pursuant to this title [Title 7. Planning and Land Use] at a properly noticed public hearing, the issues raised shall be limited to those raised in the public hearing or in written correspondence delivered to the public agency prior to, or at, the public hearing . . . ." Subdivision (b)(2) provides further: "If a public agency desires the provisions of this subdivision to apply to a matter, it shall include in any public notice issued pursuant to this title a notice substantially stating all of the following: 'If you challenge the (nature of the proposed action) in court, you may be limited to raising only those issues you or someone else raised at the public hearing described in this notice, or in written correspondence delivered to the (public entity conducting the hearing) at, or prior to, the public hearing.'"

Appellants did not receive notice of the exhaustion requirement. Accordingly, the exhaustion requirement of Government Code section 65009 does not apply.

■ GWF contends the City nevertheless has the protection of the common law doctrine of exhaustion of administrative remedies. It cites no authority for the assertion an agency may claim the exhaustion doctrine despite explicit statutory waiver of the application of the doctrine when no public notice is given. A public agency cannot claim the protection of the exhaustion doctrine despite noncompliance with a statutory mandate to provide notice of the doctrine's application. The legislative history of Government Code section 65009 provides no evidence the Legislature intended a public agency to have the choice between the common law doctrine and

statutory doctrine. Such a construction of the law would render the notice requirement meaningless.

"The general rule is that statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject or, in other words, to 'occupy the field.' [Citations.] '[G]eneral and comprehensive legislation, where course of conduct, parties, things affected, limitations and exceptions are minutely described, indicates a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter.' " (*I. E. Associates* v. *Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 [216 Cal.Rptr. 438, 702 P.2d 596].)

The provisions of Government Code section 65009 supersede the requirements of the common law doctrine of exhaustion of remedies.

## Part X

### *Timeliness of Action*

GWF contends appellants' claim regarding alleged defects in the General Plan is untimely since it was not brought within 120 days after adoption of the General Plan. They cite Government Code section 65009, subdivision (c) in support of their argument.[16]

However, the controlling statute of limitations in this action is set forth in Government Code section 65907 which requires commencement of suit within 90 days *after the date of the decision to approve the permit.* (*Beresford Neighborhood Assn.* v. *City of San Mateo* (1989) 207 Cal.App.3d 1180, 1186

---

[16] Government Code section 65009, subdivision (c) provides in pertinent part: "(c) . . . [N]o action or proceeding shall be maintained in any of the following cases by any person unless the action or proceeding is commenced and service is made on the legislative body within 120 days after the legislative body's decision:

"(1) To attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a general or specific plan. This paragraph does not apply where an action is brought based upon the complete absence of a general plan or a mandatory element thereof, but does apply to an action attacking a general plan or mandatory element thereof on the basis that it is inadequate.

"(2) To attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a zoning ordinance.

"(3) To determine the reasonableness, legality, or validity of any decision to adopt or amend any regulation attached to a specific plan.

"(4) Concerning any of the proceedings, acts, or determinations taken, done, or made prior to any of the decisions listed in paragraphs (1), (2), and (3)."

[255 Cal.Rptr. 434].) The City approved the permit for the GWF project on March 21, 1988. Appellants' petitions were timely filed on April 20, 1988.

## PART XI

### *Adequacy of the General Plan*

A. *Consideration of Documents Outside the General Plan Element.*

Government Code section 65300 requires each county and city to "adopt a comprehensive, long-term general plan for the physical development of the county or city . . . ." ▇▇▇ The general plan has been identified as being "atop the hierarchy of local government law regulating land use" and has been analogized to "a constitution for all future developments." (*Concerned Citizens of Calaveras County* v. *Board of Supervisors* (1985) 166 Cal.App.3d 90, 97 [212 Cal.Rptr. 273].) The general plan consists of "a statement of development policies . . . diagrams and text setting forth objectives, principles, standards, and plan proposals" and must include, at a minimum, the following seven elements: land use, circulation, housing, conservation, open space, noise, and safety. (Gov. Code, § 65302.) **(38)** If the plan does not reflect substantial compliance with the requirements of state law, the city or county has failed in the "performance of an act which the law specially enjoins." (*Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334, 348 [176 Cal.Rptr. 620].) "Substantial compliance" means actual compliance in respect to the substance essential to every reasonable objective of the Government Code, as distinguished from technical imperfections of form. (*Ibid.*) Whether a general plan substantially complies with the requirements of the Government Code is a question of law. (*Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 674 [188 Cal.Rptr. 233].)

▇▇▇ The lack of a mandatory element invalidates the general plan if the missing element is directly involved in the project under review. (*Guardians of Turlock's Integrity* v. *Turlock City Council* (1983) 149 Cal.App.3d 584, 592-593 [197 Cal.Rptr. 303].) The issuance of a use permit is beyond the authority of the issuing agency if the general plan is deficient in its treatment of mandatory elements which are involved in the uses sought by the permit. (*Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1184 [203 Cal.Rptr. 401]; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1982) 137 Cal.App.3d 964, 974 [187 Cal.Rptr. 379].)[17]

---

[17] GWF contends these principles do not apply because the City has chosen to adopt a "Site Plan Review" process. However, article 19 of the Hanford Municipal Code provides for site plan review in specially designated cases, such as when the use sought is subject to CEQA, in order to provide guidance in the issuance of permits. The City's election to adopt this special

Appellants contend the General Plan in this case fails to meet statutory requirements in its treatment of the land use element, the circulation element and the conservation element, and each element is implicated in the proposed GWF cogeneration project. GWF contends substantial compliance is established by consideration of EIRs which are incorporated by reference in the EIR prepared for the General Plan.[18]

GWF cites *Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289 [220 Cal.Rptr. 732] and argues a general plan may consist of several documents which a court may refer to in assessing the adequacy of a specific element. In *Buena Vista*, the court found the housing element in San Diego's general plan was in substantial compliance with the Government Code despite the inadequacy of the general plan document itself.

"While nowhere in the housing element itself is found a provision of specific sites for mobilehomes, rental housing or factory-built housing, it appears these designations may be in the detailed community plans which are referred to in City's housing element. Association has not shown these community plans fail to make adequate identification of appropriate sites." (175 Cal.App.3d at p. 301.)

There is, however, an important distinction between the general plans of San Diego and Hanford. The housing element of the San Diego general plan referred to detailed community plans, whereas the land use, circulation and conservation elements of the Hanford plan do not refer to other documents which may contain missing criteria.

Appellants cite *Camp* v. *Board of Supervisors, supra*, 123 Cal.App.3d 334, for the proposition that an adequate general plan must consist of a single,

---

review process does not render its General Plan or the issuance of use permits immune from scrutiny for compliance with state law. It is the ultimate issuance of the permit, and not the review process, which appellants assert is beyond the City's authority if the General Plan is invalid. (See *Neighborhood Action Group* v. *County of Calaveras, supra*, 156 Cal.App.3d at pp. 1183-1184, defining the two basic ways by which land uses are regulated—uses permitted as a matter of right and uses allowed subject to conditions.)

[18] GWF asks that we refer to a 1974 EIR for the annexation and redevelopment of the Kings Industrial Park and a 1983 EIR for the expansion of the Kings Industrial Park. These documents are referred to and incorporated by reference in the EIR prepared for the adoption of the General Plan. GWF contends these documents supply the allegedly missing information. The trial court took judicial notice of these documents without objection from appellants. Since the trial court ruled appellants had not exhausted their administrative remedies with respect to their claim that project approval was invalid due to an allegedly defective General Plan, the court did not address the question of whether these documents could be considered in assessing the adequacy of the General Plan or whether they supplied the necessary information.

unified document or set of documents, easily obtainable in one location, from which citizens can discern the policies governing land use. In *Camp*, the "plan" consisted of a sheaf of uncoordinated documents stuffed into an unlabeled carton. The court agreed such composition of the general plan made "resort to it for planning information an awkward exercise" and generated "doubt concerning the integrity of the plan . . . ." (123 Cal.App.3d at p. 349, fn. 8.) In contrast to the facts of *Camp*, the Hanford document is not an unassembled assortment of papers and pamphlets. Thus, neither *Buena Vista* nor *Camp* is directly on point. They do, however, provide the parameters of our analysis.

■ Government Code section 65301 authorizes adopting a single document or a group of documents as a general plan. Although a plan may properly consist of several documents, it must be logically organized.

"If a general plan is to fulfill its function as a 'constitution' guiding 'an effective planning process,' a general plan must be reasonably consistent and integrated on its face. A document that, on its face, displays substantial contradictions and inconsistencies cannot serve as an effective plan because those subject to the plan cannot tell what it says should happen or not happen. When a court rules a facially inconsistent plan unlawful and requires a local agency to adopt a consistent plan, the court is not evaluating the merits of the plan; rather, the court is simply directing the local agency to state *with reasonable clarity* what its plan is." (*Concerned Citizens of Calaveras County* v. *Board of Supervisors, supra*, 166 Cal.App.3d at p. 97, italics added.)

Standards and policies for future development must be discernible from the plan's discussion of its necessary elements. A general plan which does not set forth the required elements in an understandable manner cannot be deemed to be in substantial compliance. If missing information critical to an adequate discussion of statutory criteria is to be supplied through documents outside the general plan, a clear reference to the outside documents must appear in the challenged elements. Otherwise, it is difficult, at best, to identify standards essential to evaluate proposed uses and conditions which should be imposed upon such uses. We conclude a deficient element cannot be saved by consideration of documents which are not relied upon in the discussion of that element.

Because there is no reference to the EIR documents upon which GWF relies in the land use, circulation and conservation elements of the General Plan, these documents cannot be considered in determining whether the General Plan is in substantial compliance with regard to the challenged

elements. (See *Twain Harte Homeowners Assn.* v. *County of Tuolumne, supra,* 138 Cal.App.3d at p. 699, fn. 8.)

B. *Deficient Mandatory Elements.**

. . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed.

Costs on appeal are awarded to appellants.

Best, Acting P. J., and Ardaiz, J., concurred.

A petition for a rehearing was denied July 20, 1990, and the opinion was modified to read as printed above. The petition of real parties in interest for review by the Supreme Court was denied September 17, 1990. Mosk, J., and Arabian, J., were of the opinion that the petition should be granted.

---

* See footnote, *ante,* page 692.